HUGHES AIR CORPORATION and North Central Airlines, Inc., Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent.

Nos. 72–1853, 72–1965, 72–1863.

United States Court of Appeals, District of Columbia Circuit.

Argued June 4, 1973.

Decided Dec. 5, 1973.

As Amended Dec. 27, 1973.

Raymond J. Rasenberger, with whom James L. Devall, Washington, D. C., was on the brief, for petitioners in Nos. 72–1853 and 72–1965.

Gary Green, Washington, D. C., for petitioner in No. 72–1863.

O. D. Ozment, Deputy Gen. Counsel, Civ. Aeronautics Bd., with whom R. Tenny Johnson, Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research. Ivars V. Mellups, Atty., Civ. Aeronautics Bd., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for respondent. Robert L. Toomey, Atty., Civ. Aeronautics Bd., also entered an appearance for respondent.

Theodore I. Seamon, Washington, D. C., filed a brief on behalf of The National Air Transportation Conferences, Inc., as amicus curiae.

Before MILLER, Senior Circuit Judge, McGOWAN, Circuit Judge, and KAUFMAN *, U. S. District Judge for the District of Maryland.

McGOWAN, Circuit Judge:

Petitioners Hughes Air Corporation (Air West) and North Central Airlines, Inc., and the Air Line Pilots Association, seek review of a Civil Aeronautics Board regulation exempting certain air taxi operations from many of the statutory requirements imposed on other carriers, including principally the requirement of certification.[1]  The regula-

---

* Sitting by designation pursuant to Title 28, U.S.Code Section 292(c).

1. 14 C.F.R. Part 298 (1973), as amended by Orders 72–7–61 (July 18, 1972), and 72–9–62 (Sept. 15, 1972) (on reconsideration).
   49 U.S.C. § 1371(a) (1970) provides:
   No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation.

Exemption from the requirements of § 1371(a) is authorized by Section 416(b)(1) of the Federal Aviation Act, 49 U.S.C. § 1386(b)(1) (1970), which provides:
   The Board, from time to time and to the extent necessary, may . . . exempt from the requirements of this subchapter

tion in question, which exempts the operation of aircraft with a maximum passenger capacity of 30 and a maximum payload capacity of 7,500 pounds, amends a regulation, promulgated in 1952, that exempted the operation of aircraft with a take-off weight of 12,500 pounds or less. The effect of the new criteria is to increase the size of aircraft that can be operated under the exemption, to the competitive detriment, so it is claimed, of the non-exempt airline petitioners.[2]

Petitioners attack the legal sufficiency of the record, in light of what are asserted to be present conditions in the airline industry, to support the findings on which the regulation must, by statute, be based. We hold that the findings on each statutory issue are supported by substantial evidence, and are, therefore, conclusive.

## I

Since its inception in 1938, the federal regulatory scheme administered by the Board has always contemplated the coexistence of certificated and non-certificated sectors of the air carrier industry, the latter being exempt from most regulatory requirements and, concomitantly, unprotected against competition. Originally, all nonscheduled carriers were ex-

empt, but in 1947, when larger aircraft were introduced into nonscheduled service, the Board first differentiated exempt operations on the basis of aircraft size. The 1947 maximum gross take-off weight for exempt aircraft, 10,000 pounds, was adopted to consist with a distinction drawn in FAA safety regulations, and when the FAA later adopted a 12,500 pound demarcation between large and small craft, the limit for Board exemption was correspondingly increased.

In 1952, the Board redesignated small irregular carriers as "air taxis," and authorized them to conduct scheduled and demand operations exempt from the requirement of certification.[3] In the more than twenty years that have elapsed since regular service was first authorized on an exempted basis, certain regulatory requirements have been reimposed, but the equipment limitations established in 1949 had never been revised until the rule presently under challenge was promulgated in 1972.[4]

During that twenty-year period, however, the size and role of the air industry changed dramatically. A class of airlines certificated in the years immediately following World War II as part of a "local service experiment" grew from carrying 25,000 passengers in 1946 to two and one-half million passengers

or any provision thereof, or any rule, regulation, term, condition, or limitation prescribed thereunder, any air carrier or class of air carriers, if it finds that the enforcement of this subchapter or such provision [etc.] is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers and is not in the public interest.

2. Petitioner Pilots Association argues that no exemption, whatever the limitations upon aircraft size, allowing a class of carriers to provide scheduled air service is any longer permissible. We only note that this contention, apparently raised for the first time on appeal, is not cognizable by us under the prohibition of 49 U.S.C. § 1486(e) (1970), and was beyond the scope of the Board's investigation, Order Instituting Investigation,

70–1–15 (Jan. 5, 1970), Order on Reconsideration, 70–2–48 (Feb. 12, 1970). It is, in any event, untenable in the light of the disposition we make of the narrower argument made by the airline petitioners.

3. Economic Regulation 167 (1952). In 1969 the Board created a subclassification of air taxi operators, called "commuter air carrier," defined as an air taxi operator that "performs at least five round trips per week between two or more points" pursuant to published schedules, or "transports mail by air pursuant to a current contract with the Post Office Department." 14 C.F.R. § 298.-2.

4. All air taxis are now required to register annually with the Board, 14 C.F.R. § 298.50, and to carry liability insurance. *Id.*, §§ 298.3, .21(g). Commuter air carriers must file schedules and periodic traffic reports with the Board. *Id.*, Subpart F.

in 1954, when their status was made permanent,[5] and over twenty-six million passengers in 1970.[6] The local service lines, which include both petitioner airlines here, have meanwhile consolidated their operations by deleting short-haul, low-density markets from their routes and concentrating their efforts in the longer-haul, higher-density markets they can more efficiently serve with the large jet and turboprop fleets they have acquired. Air taxis have expanded to fill the service gap created by the withdrawal or absence of certificated local service from hundreds of markets; indeed, in the "overwhelming majority" of the 300 cities and 1,300 markets they served in 1971, commuter air taxis provided the only scheduled service.

The Board has found that the 1952 equipment limitation on air taxis has affected the service they are able to provide in two respects. First, it has had the intended effect of "channeling air taxi energies in service to short-haul, low density markets," thus "assuring that third-level operations, overall, complemented rather than competed with the certificated industry." Additionally, however, the 12,500 pound limitation has placed such a premium on seating capacity that the 15 to 19-passenger planes available for air taxi service often lack pressurization and air conditioning equipment, lavatories, adequate head room, seat pitch, fuel capacity, and, according to the Postmaster General, cargo space for the growing needs of the Postal Service. Peak load problems are acute, particularly for commuter lines that serve terminals where passengers connect with the flights of certificated carriers; and planes tend to be configured either for passengers or cargo but not for both.

On the basis of these undisputed facts, the Board concluded that, *ceteris paribus*, the public interest would be served if the air taxis were enabled to operate somewhat larger craft. Specifically, it anticipated that a capacity-based criterion allowing greater passenger and cargo space would induce aircraft manufacturers to offer more adequate planes; and that the same inducement would not be forthcoming if manufacturers had to rely on air taxis' getting individualized exemptions, since demand projections for larger craft would be more problematic, and the cost of individualized exemption proceedings would in fact prevent some air taxis from pursuing that course.[7]

The Board adopted the view of its Bureau of Operating Rights that increasing passenger capacity from the de facto limit of 15 to 19 imposed by the weight restriction to a maximum of 30, while increasing cargo capacity from the de facto limit of 5,000 pounds to a maximum of 7,500 pounds, represented the minimum change sufficient to create a "real likelihood that a revision of the Board's rule will stimulate the manufacture of new airplanes." Accordingly, it rejected, on the one hand, arguments for greater liberalization pressed by some air taxi operators, and, on the other, arguments for a maximum of 25 passengers and 6,500 pounds advanced by a number of certificated airlines.[8]

---

5. Senate Comm. on Interstate and Foreign Commerce, Providing Permanent Certificates for Local Service Air Carriers, S.Rep.No. 124, 84th Cong., 1st Sess. 6, 8 (1955).

6. CAB Order No. 72–7–61, Opinion, Part 298 Weight Limitation Investigation [hereinafter Board Opinion] at 26.

7. The necessity of inducing manufacturers to introduce a new size of craft by assuring a market for them was among the reasons that local service carriers were granted "grandfather certificate rights." S.Rep.No. 124, *supra* note 5, at 5.

8. Eight commuter air carriers, five states or state agencies, the Postmaster General, and four other parties favored liberalization; one commuter air carrier, five cities and twelve certificated carriers, along with the Pilots Association, opposed liberalization. Five certificated carriers—local service and trunk lines—suggested the 25/6,500 maxima.

Only two of the 25 or so certificated local service and trunk carrier intervenors have sought review in this court, and none of the civic parties (cities served by air taxis) have joined them.

## II

In order to exempt a class of carriers from any of the regulatory requirements deriving from the Federal Aviation Act, the Board must find that enforcement would be (1) "an undue burden" on the class to be exempted because of the "limited extent" of the class's operations, *or* because of "unusual circumstances" affecting its operations, and (2) not in the "public interest." Since exemption cannot be in the public interest unless the end that it is calculated to achieve is in the public interest, and we have already set forth the Board's purpose in exempting larger air taxi operations than heretofore, we begin with an examination of this finding.

### A. *The "Public Interest."*

Petitioners do not take issue with the Board's judgment that improved service by air taxis to passengers and shippers will be provided as a result of the modification, at least insofar as newer and better equipment will be drawn into service. But while the public interest in certification *vel non* is "distinct from the public interest in having the service provided," Air Line Pilots Association v. CAB, 148 U.S.App.D. C. 24, 458 F.2d 846, 849 (1972), the two are necessarily related when the Board predicates exemption on its belief that certification will actually prevent a service in the public interest from being provided. Thus, petitioners must contend in effect that the public interest will not in fact be served, on balance, by modifying the exemption regulation. They marshal two related arguments in support of this view.

First, they argue generally that the public is better served, wherever possible, by certificated carriers, and that Congress has implicitly so concluded in its design of the regulatory scheme. Thus, any departure from the norm of plenary economic regulation must be clearly justified. Second, the airline petitioners claim that the Board underestimated the competitive impact of existing air taxi operations on certificated carriers, and thereby erred in thinking that the increased level of competition made possible by expanding their exemption would be negligible. This economic impact, it is said, goes not only to the Board's responsibility for the continued health of the certificated network, but also increases the particularity by which departures from the norm of certification must be supported.

The relevance of petitioners' first argument concerning the undoubted "presumption in favor of certification," assumed by us in *Air Line Pilots*, is limited in this case to the Board's administrative decision to proceed by exemptive regulation rather than by entertaining individual carriers' applications for certification, or indeed exemption, along individual routes. The Board's reasons for that decision—to remove a significant financial obstacle from the path of air taxis seeking to initiate operations in excess of 12,500 pounds; to give air taxi operators the flexibility they need "quickly [to] enter markets which might help bolster their operations" and as quickly to abandon those "which prove to be a drain on their resources;" and to lessen its own administrative burden —presuppose the desirability of the enlarged commuter operations they are calculated to facilitate. We turn, therefore, to the basic issue between the parties, namely, whether the exemption of additional air taxi operations meeting the 30/7,500 limitation but weighing more than 12,500 pounds so adversely affects the public interest in petitioners' well-being as to outweigh any public interest in the benefits to be expected from it.

### 1. *Competitive impact.*

The public interest in the economic health of the local service carriers is not insubstantial. Congress has specifically charged the Board, in determining where the public interest lies, to consider "[t]he encouragement and development of an air-transportation system properly adapted to the present and

future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense." 49 U.S.C. § 1302(a) (1970). The magnitude of local service carriers' operations makes them "an integral part of our air transportation system," as Congress made clear in directing their certification.[9] Any proposal that poses a serious threat to their continued vitality would be suspect in terms of the public interest under any circumstances likely to occur. Petitioners' difficulty in this case, however, has been in demonstrating that they are indeed subjected to significant competitive injury. The mere existence of some competition cannot be dispositive, inasmuch as the Congress has also recognized a public interest in "[c]ompetition to the extent necessary to assure the sound development" of the air-transportation system. 49 U.S.C. § 1302(d)(1970).

One of the petitioning carriers adduced before the Board estimates of traffic diverted along those of its routes that are served competitively by exempt carriers. The Board rejected the data, however, as "seriously flawed by a failure to relate its traffic reduction in a number of markets to the introduction of air taxi services, and by a tendency to disregard such factors as independent service cutbacks by [petitioner], increases in certificated competition, and the effects of surface travel competition stimulated by highway construction." These important defects do not, of course, establish the contrary proposition, but the Board did not, as petitioners suggest, shift the burden of proof to the opponents of change by relying on the absence of evidence either way that taxis seriously encroached on the local service market.

The Board considered data showing, for example, the number of commuter passengers in the 150 top commuter markets also served by local service carriers, and their significance as a per-

centage of the local service carriers' passengers and revenue passenger miles. Commuter passengers and revenue passenger miles were highest as a percentage of local system passengers for Air West, being 3.5 and 1.6 percent respectively.

Naturally, petitioners focus attention on the competitive significance of uncertificated service in the particular markets where air taxis have their largest market shares. In 65 markets, for example, the taxis had a majority of the traffic in 1969.[10] But the Board considered the significance of the disaggregated data as well and offered rational reasons why, even in some of the markets identified by petitioners as peculiarly impinged upon by air taxi service, the "appearance of competition is illusory." To take but one example, with respect to the Los Angeles-Ontario/Riverside market, which is served by both Western, a certificated carrier, and Golden West, an air taxi, the Board said (at 23):

> In actuality, this appearance of competition is illusory because only Golden West operates the kind of frequent, turn-around service that can be expected to make a dent against the convenient surface transportation modes that capture the overwhelming bulk of the traffic moving between these points. On the other hand, Western's single daily round trip with jet aircraft is not designed to attract a substantial number of Los Angeles-Ontario passengers, but to combine Sacramento-Los Angeles and Sacramento-Ontario traffic flows on the same flight, and to position its aircraft for Ontario-beyond routings.

Surely we cannot say that the Board's broader approach to market analysis, which takes account of surface transportation alternatives and looks at air taxi growth in the larger context of local service growth as well, lacks rationality. Moreover, the Board recognized "that diversion estimates have been complicated

---

9. S.Rep.No.124, *supra* note 5, at 2.

10. 2 CAB Bureau of Operating Rights, Service to Small Communities 50 (1972).

in this proceeding by the absence of extensive commuter traffic data for specific markets." Accordingly, it did not attempt to chisel into stone its present anticipation, based on experience to date, of the impact of expanded air taxi operations. Rather, it declared its readiness "to use [its] regulatory powers to preserve the certificated system from harmful competition by the exempted carriers," should the need arise.[11] As we said in American Airlines v. CAB, 98 U.S.App.D.C. 348, 235 F.2d 845, 851 (1956), where certificated carriers opposed a liberalization of the terms of the exemption for supplemental carriers:

> [T]he finding of the Board that its proposed . . . service will not result in adverse economic effects upon the certificated system is a conclusion which the Board is entitled to draw if the record supports it with evidence; and . . . the assurance of the Board that it will not hereafter permit adverse economic effects to jeopardize the certificated system or to pose a substantial threat to it, should be accepted and respected by this court.

The Board's assurance must be taken seriously, not only in our consideration of the exemption here under review, but also in any later proceedings triggered by a change in circumstances.[12]

2. *Rulemaking versus individual proceedings.*

That the public interest favors generally the proposed liberalization of the criteria for exemption does not, of course, lead inescapably to the conclusion that the Board should proceed by rulemaking to exempt all air taxi operations meeting any particular set of criteria. There may be individual routes along which, examination would reveal, the expanded exemption will so affect certificated carriers as to tip the public interest balance against expanded taxi service. Or, in particularly strong and constant markets, an air taxi's need for flexibility may be too slight to offset whatever competitive detriment it inflicts on a certificated carrier.

Identification of such markets, however, inevitably entails some cost both to the Board and to the affected air taxis. Identification might not require extensive application procedures every time an air taxi seeks to operate aircraft between 12,500 pounds and the 30/7,500 maxima on a particular route. Petitioners have argued, for example, that individual certification—and, presumably, exemption—proceedings could be limited to the approximately 300 markets in which certificated and exempted carriers compete. The Board considered that possibility, however, and rejected it in favor of a blanket exemption, for the reasons stated earlier.[13]

---

11. It is significant that the Board made its liberalization of Part 298 inapplicable to intra-Hawaii and intra-Alaska air taxi operations (the latter pending the outcome of an on-going Alaska Service Investigation). *See* 14 C.F.R. § 298.2 (definition of "large aircraft" retains 12,500-pound criterion in Alaska and Hawaii). Certificated local service carriers in those states had asked that air taxi service there be excluded from the scope of the Board's investigation. Since a substantial portion of certificated services are provided with small aircraft, relaxation of the weight limitation would have a large, adverse competitive impact, they argued. Their petition to narrow the scope of investigation was denied, but the Board considered and accepted their argument.

In addition, the Board had demonstrated, even prior to liberalization of Part 298, an

ability and willingness to identify situations in which air taxis' operation of large aircraft is better conducted pursuant to certification rather than exemption. *See* Reopened TAG-Wright Case, Order 72-2-52 (Feb. 14, 1972); Aspen Airways, Order 71-1-98 (Jan. 20, 1971).

12. This court has previously required the Board to reevaluate the grounds for an exemption when conditions changed and the continued public interest in exemption is thereby drawn in question. *See* Air Line Pilots Ass'n v. CAB, *supra* page 571.

13. *Supra* at 571. In addition, it should be noted, an application would also be required whenever an air taxi, once certificated for a particular market, sought to discontinue its service on that route. Notice and a hearing on such application are required by statute. 49 U.S.C. § 1371(j) (1970).

At the minimum, then, the Board concluded that the public cost of entertaining particular applications from air taxi operators in competitive markets, which one can reasonably suppose would generally be challenged, outweighs the public benefit to be derived therefrom. This is a matter of judgment, incapable of mathematical nicety since both sides of the equation involve terms that are not quantifiable in any practical way, even if their magnitudes can be expressed in a verbal formula.[14]

■ The Board cannot be expected, therefore, to calibrate precisely the elements of the public interest favoring and opposing individual proceedings. As we said in *Air Line Pilots, supra,* 458 F.2d, at 850, its proper course is to make an informed judgment, ". . . in short, to balance considerations of administrative efficiency against the requirements of an effective regulatory system." There cannot be a blanket rule against blanket rules; "[i]t is clearly desirable that the Board be able to formulate general exemptive regulations which apply to a class of air carriers and authorize them to operate within certain limits." *Id.* at 849. Only when, as in the last-mentioned case, such general exemptions create a likelihood of derogating from some overriding goal of the regulatory scheme should they be set aside. Where the general regulation is based on a reasoned consideration of all the basic goals that might be compromised, the Board should be allowed to pursue the regulatory course it deems most advisable.[15] The ultimate accountability of the Board for the adequacy of air service inevitably carries with it latitude in the choice of means to discharge that undertaking.

■ The purposes implicated in any exemption decision are those of maintaining the health of the certificated system and assuring that the service required in the public interest is adequately provided. As we have seen, concern with the quality of service available to the public prompted the Board to consider modifying its standards for exemption of air taxi operations in the first place; and the competitive impact of doing so on certificated carriers was a central issue of the proceeding it conducted. In light of the Board's declared willingness to use its regulatory powers in order to reimpose the requirements of certification where competitive considerations warrant doing so, we cannot say the Board was obliged to work the other way round, using its exemptive power only in particular cases, without regard to the burdens that course would entail on both the public interest and the air taxi industry.[16]

---

14. What, for example, is the public cost of the delay that necessarily attends individualized proceedings? The public cost that results when some air taxis that could qualify for certification, or the liberalized exemption, and thereby improve their service, fail to do so because the expense of application proceedings deters their filing? On the other side, how great is the public interest in preserving local service carriers from such incremental competition as would not materialize if each competing air taxi operation had to justify its use of expanded equipment?

15. Indeed, the Supreme Court, while acknowledging that "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency," noted a preference for rulemaking where practicable. Securities & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). *See* Weinberger v. Hynson, Westcott and Dunning, Inc., 412 U.S. 609, 93 S. Ct. 2469, 37 L.Ed.2d 207 (1973).

16. In Air Line Pilots, *supra,* we cautioned (458 F.2d at 850) : "The spectre of administrative burdens . . . cannot be allowed to obscure the danger that an exemption granted under general regulations will shield carriers from certification long after the scale of their operations renders the exemption inconsistent with the regulatory scheme." We adhere to that principle. In the instant case, however, where the "limited extent" of exempted operations is itself a predicate for the exemption, we perceive no danger that the Board's concern with administrative ease might obscure a need for particularized consideration, lest the exempt carriers' "scale of operations renders exemp-

### B. *"Undue Burden."*

In analyzing the "public interest" finding, we have already noted that enforcement of a regulatory requirement, such as that of certification, cannot be in the public interest where such enforcement is inconsistent with the provision of air service that would be in the public interest. A statute more simply structured than Section 416(b) might have required no more than that certification and service be mutually exclusive. The Board could then enforce the norm of certification, relaxing it only where necessary to assure that no service in the public interest is precluded by the burden of certification. Perhaps motivated by an excess of caution lest the norm of certification be undermined, Congress went on, however, to specify that no exemption be granted unless enforcement would be "an undue burden on such air carrier or class of air carriers" for one of the two specified reasons. Either the "limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers" must make enforcement too burdensome.[17] In this case, the Board found that certification would be an "undue burden" on air taxis as a class both because of the "limited extent" of their operations, and because of the "unusual circumstances" affecting their operations, to wit, pandemic financial instability and a correlative need for flexibility in order to provide financially risky, nonsubsidized services.

### 1. *Analytic framework.*

Congress did not specify the factors to be taken account of by the Board in making its findings of "undue burden" in terms of the "limited extent of," or the "unusual circumstances affecting," carrier operations. These terms are, thus, to be read in a straightforward manner, informed by the good judgment of the Board charged with their interpretation. *See* American Airlines, Inc. v. CAB, 97 U.S.App.D.C. 324, 231 F.2d 483, 487 n. 4 (1956). We think it clear, however, from the very purpose of Section 416, that not every such limitation of extent or unusual circumstance is cognizable. They are relevant only insofar as they reflect on whether nonexemption would be an "undue burden"—by which persumably is meant financial burden—on the carriers to be exempted. The dimensions in which a class of carriers' operations are limited or its circumstances unusual, then, must be, if not financial, at least of some financial significance.[18]

The financial burden of non-exemption arises differently in two distinct situations. In some situations, requiring certification would not actually preclude rendition of the service because it would still be worthwhile, albeit more costly, for the carrier to apply for certi-

---

tion inconsistent with the regulatory scheme." If the Board's determination that certification would create an undue burden on the exempted carriers is supportable, any solicitude for an "undue burden" on the Board itself is unnecessary. If the finding is not supportable, then no administrative burden on the agency could substitute for the statutorily required burden on the carriers. Accordingly, we discount the Board's internal administrative efficiency argument for proceeding by regulation as essentially a makeweight.

17. Conceivably, therefore, service that would be in the public interest might be allowed to go unprovided because a carrier could not carry a burden of regulation, *e. g.*, certification, but its inability to do so derives not from the "limited extent" of its operations

nor from a factor that is "unusual." Pan American World Airways, Inc. v. CAB, 104. U.S.App.D.C. 288, 261 F.2d 754, 758 (1958), held that a carrier's "financial distress is not a circumstance which, standing alone, meets the requirements of § 416(b)." If, in that case, non-exemption meant non-rendition of service, then we have an example of such an instance.

18. The limited size of air taxis' current equipment, for example, could not possibly be apposite, by itself, to the burden that certification would impose; it is only because their small equipment generates commensurately limited revenue that that factor takes on significance. To the extent the Board's opinion intimates a contrary view, we must disagree. *Compare* Board Opinion at 33, *with id.* at 34 n. 49.

fication. There the costs of certification [19] do not exceed the profits anticipated from the certificated operation. The burden of non-exemption in such cases is the cost of getting a certificate.

This is not true where the costs of certification exceed the benefits the carrier anticipates from the certificated operation, or where the time required to achieve certification extends beyond the time at which a non-recurring opportunity must be seized.[20] In these situations, requiring certification precludes the carrier from offering the additional service. Where the costs of certification exceed the expected benefits, the burden of non-exemption is that the carrier must continue to make do with its present operating authority; where the obstacle to certification is one of timing, the burden is that the carrier must forego an opportunity for "increased efficiency in [the] utilization of its planes and other equipment."[21] In either case, circumstances may make this burden an undue one.[22]

Although the Board's opinion is less than perfectly clear on the point, we understand the Board to have found, in essence, that requiring certification of air taxis that wish to operate equipment with a take-off weight in excess of 12,500 pounds but within the 30/7,500 maxima would generally preclude their taking advantage of the Part 298 liberalization here under review.[23] Since we think the Board could rationally draw that inference from the evidence, as summarized below, we are not faced with determining, in this proceeding, whether a non-preclusive burden of certification could ever be an "undue burden" for Section 416 purposes.[24] We turn, therefore, to the basis for the Board's inference that the certification requirement would be prohibitive, bearing in mind that, unless that basis is the limited extent of or unusual circumstances affecting taxi operations, it will not support exemption under 416(b).

## 2. *Findings of fact.*

Over the last twenty years, the air taxi industry has grown in response to changing traffic demands in small communities and "service gaps produced by shifting patterns of certificated operations."[25] In that period, 238

19. Such costs include the expense of certification proceedings, profits foregone pending their conclusion, the continuing costs of compliance with the regulatory requirements incident to certification, and losses sustained while permission is sought to withdraw from unprofitable certificated service, discounted by the probability of a route being unremunerative.

20. *See, e. g.*, American Airlines, Inc. v. CAB, 97 U.S.App.D.C. 324, 231 F.2d 483, 487, 488 (1956) (Surface Mail Experiment Case); World Airways, Lease Agreement, 42 C.A.B. 820 (1965); Seaboard World Airlines, Lease Agreement, 41 C.A.B. 738 (1964).

21. Kodiak Airways, Inc. v. CAB, 144 U.S. App.D.C. 371, 447 F.2d 341, 357 (1971).

22. *See, e. g.*, World Airways, Inc. v. CAB, 145 U.S.App.D.C. 3, 447 F.2d 377, 381 & n. 5 (1971).

23. At one point the Board characterized the cost of certification as merely "a substantial financial strain on air taxis." Board Opinion at 34. In conclusion, however, the Board said, "Such requirements [of certification and decertification] would *constitute*

*an effective bar* to the continuation of non-subsidized air taxi services." *Id.* at 35 (emphasis added.) This statement is consistent with prior conclusions, such as that "reliance on individual exemption procedures [*i. e.*, without Part 298 liberalization] would virtually eliminate any incentive for manufacturers to build new [larger] airplanes designed for air taxi, particularly commuter service," *id.* at 13; and that air taxis need a degree of operational flexibility inconsistent with certification "if they are to continue to fulfill their important role in the national air transportation picture." *Id.* at 33.

24. The difficulty presented by the affirmative of the proposition, of course, is that exemption in circumstances where certification would *ex hypothesi*, be sought, despite its costs, impairs the integrity of the norm of certification that Congress clearly erected. *Cf.* Air Line Pilots Ass'n v. CAB, *supra* page 571.

25. Board Opinion at 21. The air taxi industry's growth has been less than proportional, however, to that of the air transportation industry overall in the same period. *Id.* at 22.

points have been deleted from the certificated airline system as the result of 416 route deletions. At the time of the Board's decision, certificated operations were suspended "at some 50 additional points." In thirty-four instances certificated carriers had entered into agreements with commuter carriers for suspension of certificated, and substitution of non-certified, service.[26] At another thirty-one points, certificated carriers had sought suspension authority on the ground that commuter carriers could service the market adequately even without such an agreement.

Expansion into markets previously served by certificated carriers has not altered—indeed, it has reinforced—the basic fact that air taxis continue to serve primarily short-haul markets of very low density. More than 60% of fiscal 1971 air taxi passengers traveled in markets of fewer than 100 miles, and more than 90% in markets of less than 200 miles.[27] During the last six months of 1969, mean passenger enplanements per day per point were only 5.7. Even the 40 largest commuter carriers enplaned five or fewer passengers per day in 78% of the communities they served;[28] in only 4% of their markets were 40 or more passengers enplaned. In these relatively less dense markets, peak load problems arising from the small seating capacity of commuters' airplanes were often acute; additional flights or extra sections were required, and with small equipment this drove up seat mile costs.[29]

In fiscal 1970 the entire commuter industry, numbering 126 firms, generated total estimated revenues of $70 million, or an average of $550,000 per firm.[30] A 1970 study done for the Department of Transportation found that the commuter industry as a whole has been operating at a loss, with individual firms' performances ranging from substantial losses to only slight profitability.[31] The

26. Board procedures for approval of this type of agreement were the subject of our decision in Air Line Pilots Ass'n v. CAB, *supra*, page 571.

27. At the same time nearly 90% of certificated carriers' passengers flew in markets of more than 200 miles. Board Opinion at 22.

28. Even the largest commuters, therefore, are serving primarily communities that are not economically viable for certificated service. *Cf.* 14 C.F.R. § 399.11(d), "Use it or lose it" policy for subsidized local service carriers:

In evaluating the continuing need for air service at any point or on any route the Board will use the minimum traffic standard of five passengers as a guideline . . . . When a city or route segment fails to make continued use of subsidized services, the carrier is free, and is encouraged, to apply for suspension of service in advance of a Board proceeding to terminate the certification. . . .

29. Board Opinion at 8. Larger aircraft, were they available, could be used on these routes at peak hours, and be put into short-haul cargo service or demand service at other times to get effective utilization without decreasing the frequency of service in the markets with greater amplitude. *See* testimony of Fred L. Austin, President, Golden West Airlines, Inc., JA 254-55.

30. Board Opinion at 34. For purposes of perspective, it may be noted that the nine certificated local service carriers had total revenues nine times as great as the 126 commuters; they averaged $72 million each in 1970 revenues. *Id.*

31. Waldo and Edwards, Inc., The U. S. Commuter Airline Industry, Its Current Status and Future Outlook 41 (1970). Petitioners object to the Board's noticing this work, although they concede that none of the facts taken therefrom are "crucial to the decision." Even if objection to official notice of clearly legislative facts in a rulemaking proceeding is ever proper, *see* 2 K. Davis, Admin. L. Treatise § 15.03, at 353 (1958), this is not a situation in which confrontation and cross-examination would have been worthwhile. As Judge Friendly said in a slightly different context, trial is unnecessary to develop the "general characteristics of an industry," as opposed to "the peculiar situation of individual parties who know more about this than anyone else." WBEN, Inc. v. United States, 396 F.2d 601, 618 (2d Cir.), cert. denied, 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968).

We note, moreover, no evidence "of record" contradicts, even implicitly, the conclusion drawn by Waldo and Edwards, *supra.* Indeed, as the Board noted in its opinion, only about 45 of the 400 air taxis participating in the proceeding appeared at the hear-

failure rate among commuters is quite high and old firms leave and new ones enter the industry regularly.[32]

Unlike certificated carriers, air taxis are not eligible for subsidization by the Board. Again in contrast to the certificated carriers, their routes are entirely unprotected from the entry of competitors. These short-haul routes, moreover, must typically be operated against the competition of inexpensive surface transportation modes.

3. *Inferences.*

■ The Board concluded that requiring certification of air taxis' operations above the 12,500-pound weight limitation would effectively preclude such operations. From the above-described situation of the air taxi industry, it is obvious that the routes for which certification would be sought, were it required, would be few indeed if certification represents any substantial financial obstacle. Route protection, the major benefit of certification, would not be a significant offsetting factor in the calculus of whether to seek certification, because the routes served by air taxis produce such limited revenues. The prospect of being subsidized can hardly be deemed a significant allure, since so many air taxi routes are precisely those from which certificated carriers withdrew because they could not support certificated service even with a subsidy.

In support of its inference that requiring certification would preclude the rendition of expanded air taxi service, the Board has not in this or any previous exemption case attempted to determine precisely the costs of certification. No one would deny, however, and the Board is competent to determine, as it did, that the costs, in time and money, are "substantial."[33]

From the above-described situation of the air taxi industry, the Board's inference of preclusiveness is a rational one.

The remaining questions on which we must be satisfied with respect to the rationality of the Board's answers are (1) whether the preclusive burden of requiring certification—that air taxis would be confined to their present operating authority—is an undue burden; and, if so, (2) whether that is by reason of the limited extent of, or unusual circumstances affecting, the air taxis' operations. There is room for little doubt regarding either of these questions.

The air taxi industry is, as recognized by the Board, operating in an "economic environment" of "high financial risk," with the result that the average firm is realizing losses and there is a high rate of failure. If somewhat larger planes could be introduced on routes that justify them, more efficient operations might be possible, or so the Board is competent to conclude. The preferred method of achieving this improvement, by certifi-

---

ings, which were held at four cities across the country. A majority of those appearing were not even represented by counsel. *See also* Motion of Puerto Rico Int'l Airlines, Inc. and Hub Airlines, Inc. for Additional Prehearing Conference, JA 56, to sever proceedings respecting demand operators from those involving scheduled operators on the ground that movants and the scheduled operators generally, being "marginal from an economic standpoint," would be able thereby to "reduce the cost of their participation."

32. Board Opinion at 34 n. 51; 2 Bureau of Operating Rights, CAB, Service to Small Communities 46 (1972) (detailed figures on failure and entry).

33. No certificate may be issued without a public hearing, for example. 49 U.S.C. §

1371. Intervention at certification hearings is liberally granted, *see* C.F.R. § 302.15, and the proceedings may be quite complex and protracted. *See generally* 14 C.F.R. Part 302, Subparts A and I.

For illustrative purposes, with respect to the matter of monetary cost, the Board in this case referred to "the recent Reopened TAG-Wright Case, where Wright estimated that its legal and consultant fees, alone, expended in acquiring a certificate in the reopened proceeding would amount to $50,000." Board Opinion at 34 n. 51. As early as 1955, however, the expense to carriers of recertification proceedings was "estimated upward to [sic] $100,000 for each renewal." S.Rep.No. 124, *supra* note 5, at 4.

cation, is effectively foreclosed. The alternative method, by exemption, must be made available if it is to be achieved at all.

The Board acknowledged that it "can only estimate, after a careful analysis of the record evidence and officially noticeable data, where the line should be drawn separating air taxi from certificated aircraft." We have no warrant in this record for second-guessing the wisdom of the Board's choice to locate the line at 30/7,500. It is not acting irrationally in concluding that the 12,500-pound limitation is too low generally to permit efficient operations. The Board established the 12,500-pound rule itself, and the burden on air taxis of its rigidly adhering to it in the face of developing experience would indeed be "undue."[34]

It is evident that the burden of non-exemption arises from the "limited extent" of the air taxis' operations. Indeed, since relief from the burden entails liberalization of the extent to which they can conduct non-certificated operations,[35] it is difficult to imagine how any other conclusion could be reached. Even petitioners do not attempt to challenge it broadside, maintaining instead that the use of industry-wide data and averages "hide some not-so-limited operations of much larger than average" commuters.[36] This, however, is little more than a renewed assault on the Board's decision, upheld earlier, to proceed pursuant to statutory authority to exempt a class, rather than individual carriers.[37]

The Board's alternative finding that "unusual circumstances" make non-exemption an undue burden derives from the same general circumstances as its "limited extent" finding, *viz.*, the tertiary nature of the air taxi industry. In this instance the emphasis is, appropriately, a little different; it is on "the operating flexibility air taxis must have to conduct" their nonsubsidized, high-risk services in short-haul, low-density markets.

The air taxis do seem to have an unusual need for flexibility, attributable to the thinness of their markets, where slight vicissitudes in demand have a greater impact on service decisions. Petitioners do not really controvert the existence of that need, but rather deny that the certification process would, or need, be as inflexible as the Board has suggested. There may be some portion of truth in this surmise, but the subject of the Board's rulemaking proceeding was exemption, not procedures for certification. While the Board should be continuously alert to the improvement of its certification procedures, the record made in this proceeding provides no

---

34. *See* World Airways, Inc. v. CAB, 145 U.S.App.D.C. 3, 447 F.2d 377, 381 (1971), where the loss of sunken investment in arranging for charter flights made unlawful by a revision of CAB regulations was found to be "undue." For cases where exemptions were granted to avert underutilization of equipment while certification proceedings were pending, *see* Kodiak Airways, Inc. v. CAB, 144 U.S.App.D.C. 371, 447 F.2d 341, 357 (1971).

35. The air tax exemption is apparently unique among class exemptions (those promulgated by rule rather than by adjudication) in being defined by reference to the size of carrier operations. *Cf.* 14 C.F.R. Part 288, Exemption of air carriers for military transportation; *id.*, Part 292, Classification and exemption of Alaskan air carriers.

36. They note, for example, that Executive Airlines, the largest commuter, had 1970 revenues of $7.9 million. Of course, the existence of one such commuter necessarily implies that many others had revenues substantially *less* than the industry average of $550,000. Nor are high revenues necessarily inconsistent with a finding of "limited extent" respecting a particular carrier flying small aircraft at a loss. As petitioners candidly point out, Executive Airlines is presently in bankruptcy proceedings.

37. Petitioners' other theory, that the Board improperly found only that the *relatively* limited extent of the air taxi industry, rather than its absolute size, makes non-exemption an undue burden, would be significant if its premise were true, but it is not.

basis for invalidating the Board's decision.[38]

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge, concurs in the result.

---

38. For ought we know, an abbreviated procedure for certification of air taxis might be so responsive to their needs that, far from being preclusive, it would not even deny them their needed flexibility. Since the "unusual circumstances" finding is not, however, essential to disposition of this case, we have no occasion to pursue the matter further.