**UNION OF PROFESSIONAL AIRMEN (an affiliate of the Air Line Pilots Association International), Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**No. 73–1526.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1974.

Decided April 11, 1975.

Daniel M. Katz, Washington, D. C., with whom Gary Green, Washington, D. C., was on the brief, for petitioner.

Glen M. Bendixsen, Associate Gen. Counsel, Litigation and Research, C. A. B., with whom Richard Littell, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Joan Marie Frankel, Attys., C. A. B., and Carl D. Lawson, Atty., Dept. of Justice, were on the brief, for respondent. R. Tenny Johnson, Gen. Counsel, C. A. B., at the time the record was filed, also entered an appearance for respondent.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This is a petition by Union of Professional Airmen (UPA), to review an order of the Civil Aeronautics Board (CAB). The order dismissed a complaint filed by UPA against Shawnee Airlines, Inc., based upon alleged violations of the Railway Labor Act by Shawnee. The ground of the dismissal was that the Board lacked jurisdiction over the complaint. The issue presented here is whether the Board lacks jurisdiction to enforce compliance with the Railway Labor Act against an air carrier which, by virtue of a general Board exemption, has been authorized to provide air transportation without a certificate. We affirm the Board.

Section 401(a) of the Federal Aviation Act, 49 U.S.C. § 1371(a), provides that "No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation." Section 401(k)(4) of the Act, 49 U.S.C. § 1371(k)(4), provides: "It shall be a condition upon the holding of a certificate by any air carrier that such carrier shall comply with sections 181 to 188 of Title 45 [title II of the Railway Labor Act, as amended]". Section 416(b)(1), 49 U.S.C. § 1386(b)(1), authorizes the Board under certain conditions to exempt an air carrier from the requirement of certification. Pursuant to this authorization the Board by regulation, 14 C.F.R. § 298.11(a), has exempted air taxi operators [1] from the requirement that they obtain certificates. As a "scheduled air taxi operator" Shawnee Airlines operates under such an exemption.

UPA is a labor organization established for the purpose of representing crew members in the employ of air taxi operators, commuter airlines and similar carriers. In 1971 UPA was certified by the National Mediation Board as collective bargaining representative for Shawnee pilots under the Railway Labor Act. The UPA complaint to the CAB in the case before us charged that before UPA

---

1. Air taxi operators are defined by 14 C.F.R. § 298.3:

   (a) There is hereby established a classification of air carriers, designated "air taxi operators" which engage in the direct air transportation of passengers and/or property, and/or in the transportation within the 48 contiguous States, Alaska or Hawaii of mail by aircraft and which:

   (1) Do not, directly or indirectly, utilize large aircraft in air transportation;

   (2) Do not hold a certificate of public convenience and necessity or other economic authority issued by the Board;

   (3) Have and maintain in effect liability insurance coverage in compliance with the requirements set forth in Subpart D of this part; and

   (4) File with the Board's Docket Section a signed counterpart of CAB Agreement 18900 in the form attached hereto as Appendix B (CAB Form 263), and a tariff embodying the provisions of the counterpart in the form attached hereto as Appendix A (CAB Form 298–B), if required by Subpart G of this part.

   [footnotes omitted]

was certified as collective bargaining representative Shawnee discharged five pilots for attempting to organize and select a collective bargaining representative, and that by this and other specified acts Shawnee violated the collective bargaining rights of UPA and the pilots. UPA further charged that (1) following the certification of UPA as collective bargaining representative, Shawnee discharged an additional pilot, who was chairman of the Shawnee Pilots' Master Executive Council and Negotiating Committee, solely on account of his union activities, and (2) Shawnee failed and refused to bargain in good faith with UPA during negotiations for an agreement covering rates of pay, rules and working conditions. The complaint alleged that by these acts Shawnee violated and continued to violate the collective bargaining provisions of the Railway Labor Act, 45 U.S.C. § 152, First, Second, Third and Fourth,[2] and section 401(k)(4)of the Federal Aviation Act, 49 U.S.C. § 1371(k)(4).

UPA prayed for an order from the Board (1) directing Shawnee to cease and desist from the acts and conduct complained of, (2) directing Shawnee to take immediate and effective measures to comply with section 401(k)(4) of the Federal Aviation Act and with the Railway Labor Act, (3) directing Shawnee to offer immediate reinstatement to the discharged pilots and to make them whole for all losses suffered, and (4) providing that in the event of Shawnee's failure to do so, its authority to engage in air transportation be terminated or revoked.

Shawnee answered the complaint, conceding that it was required to comply with title II of the Railway Labor Act as a condition of holding any certificate to engage in air transportation, but denying that it had been guilty of the violations alleged. The CAB's Bureau of Enforcement concluded that there were reasonable grounds to believe that the

Act had been violated and that a formal investigation by the CAB would be in the public interest. Thus, on January 20, 1971 the Bureau docketed a petition for enforcement, thereby instituting an enforcement proceeding against Shawnee Airlines. 14 C.F.R. § 302.206.

Shortly before the hearing on UPA's complaint Shawnee filed a motion to dismiss for lack of jurisdiction. The ground of the motion was that by its terms section 401(k)(4) of the Federal Aviation Act applied only to an air carrier operating under a certificate authorizing such air carrier to engage in transportation, and that since Shawnee operated not under a certificate but under the Board's authority to permit operations without a certificate, section 401(k)(4) did not apply. UPA and the Bureau of Enforcement opposed the motion, contending that it reflected an incorrect interpretation of the Act. Briefs on the jurisdictional issue were filed by all parties and the hearing was postponed pending disposition of the motion. On March 14, 1973 the Board granted Shawnee's motion and dismissed the enforcement proceedings. CAB Order 73–3–43.

"We are unable to conclude" said the Board, "that section 401(k)(4) charges the Board with responsibility for ascertaining whether an air taxi operator is in violation of the Railway Labor Act or vests any special jurisdiction in it with respect to any such violation." The Board reasoned that the fourth subsection of section 401(k) of the Federal Aviation Act, 49 U.S.C. § 1371(k)(4), which conditions "the holding of a certificate" upon compliance with the collective bargaining provisions of the Railway Labor Act, "is restricted to certificated carriers and does not extend to air taxis. Thus, subsections (1) and (2) are worded to apply to 'every air carrier,' whereas subsection (4) is expressed in terms of 'the holding of a certificate by any air carrier.' Such a variation in the language

---

2. By section 201 of the Railway Labor Act, 45 U.S.C. § 181, these collective bargaining provisions of 45 U.S.C. § 152 are extended to cover "every common carrier by air engaged in interstate or foreign commerce."

within a section of the Act substantiates the view that the Congress intended the subsections to have differing applicability . . .." [3] Although section 416(b)(2) of the Act, 49 U.S.C. § 1386(b)(2), provides, with certain specified exceptions which do not include subsection 401(k)(4), that the "Board shall not exempt any air carrier from any provision of subsection (k)" of section 401 (49 U.S.C. § 1371(k)), the Board thought that since subsection (k)(4) in terms applied only to carriers holding a certificate, that section "itself contains a built-in limitation upon its applicability." Moreover, the Board perceived "no showing that an application of section 401(k)(4) other than in accordance with its literal terms is required to achieve any of the objectives of the Federal Aviation Act." Finally, the Board summarized its position, saying "the Board declines to assume the role of a general labor board for the airline industry. The Board is of the opinion that the UPA

complaint does not state facts which warrant an investigation or other action by the Board, and the complaint will be dismissed." [4]

Both parties in their briefs have delved into the legislative history of section 401(k)(4), and we have carefully considered the materials produced by their research. We find that the question now presented was not discussed or mentioned in any legislative hearing or debate and apparently never occurred to those who drafted and enacted section 401(k)(4) and its statutory predecessors. Nevertheless, since the petitioners rely heavily on their interpretation of the legislative history of the statute we briefly trace its background.

We begin with the Air Mail Act of 1934, ch. 466, 48 Stat. 933. This statute was enacted in the wake of the cancellation of air mail contracts by President Roosevelt February 19, 1934. On March 7, 1934 President Roosevelt wrote to

---

**3.** Section 401(k), 49 U.S.C. § 1371(k), provides:

(k) Compliance with labor legislation.

(1) Every air carrier shall maintain rates of compensation, maximum hours, and other working conditions and relations of all of its pilots and copilots who are engaged in interstate air transportation within the continental United States (not including Alaska) so as to conform with decision numbered 83 made by the National Labor Board on May 10, 1934, notwithstanding any limitation therein as to the period of its effectiveness.

(2) Every air carrier shall maintain rates of compensation for all of its pilots and copilots who are engaged in overseas or foreign air transportation or air transportation wholly within a Territory or possession of the United States, the minimum of which shall be not less, upon an annual basis, than the compensation required to be paid under said decision 83 for comparable service to pilots and copilots engaged in interstate air transportation within the continental United States (not including Alaska).

(3) Nothing herein contained shall be construed as restricting the right of any such pilots or copilots, or other employees, of any such air carrier to obtain by collective bargaining higher rates of compensation or more favorable working conditions or relations.

(4) It shall be a condition upon the holding of a certificate by any air carrier that such carrier shall comply with sections 181 to 188 of Title 45 [title II of the Railway Labor Act, as amended].

(5) The term "pilot" as used in this subsection shall mean an employee who is responsible for the manipulation of or who manipulates the flight controls of an aircraft while under way including take off and landing of such aircraft, and the term "copilot" as used in this subsection shall mean an employee any part of whose duty is to assist or relieve the pilot in such manipulation, and who is properly qualified to serve as, and holds a currently effective airman certificate authorizing him to serve as, such pilot or copilot.

**4.** We reject the Board's suggestion, in its decision and on brief in this court, that because it lacks expertise in labor matters it could properly decline to assume jurisdiction over a complaint alleging violations of the Railway Labor Act. At least as to carriers operating under a certificate, Congress by section 401(k)(4) has given the Board such jurisdiction and certified the Board's competency to exercise it. *See* Air Line Pilots Association v. Southern Airways, Inc., 36 C.A.B. 430, 431, 462–67 (1962). The issue before us therefore is whether Congress also intended that the Board have the same jurisdiction with respect to carriers operating under an exemption.

Senator McKellar recommending new legislation to provide for the air mail service and govern the award of air mail contracts. The President's letter, which appears at 78 Cong. Rec. 4041 (1934), suggested a number of provisions which should be incorporated in the new law. One suggestion was "Public safety calls for pilots of high character and great skill. The occupation is a hazardous one. Therefore, the law should provide for a method to fix maximum flying hours, minimum pay, and a system for retirement or annuity benefits." On March 9, Senator McKellar took the floor to introduce a bill, S.3012, which he said was "in line with the President's letter to us of March 7 on the subject of air mail." 78 Cong.Rec. 4041. Section 11 of the bill as introduced provides:

> Sec. 11. The Secretary of Commerce shall, and he is hereby, authorized and directed to prescribe the maximum flying hours of pilots and/or copilots on air-mail lines, the minimum pay of pilots and/or copilots on such lines, safe operation methods, and authorized to approve any plans made by air-mail operating companies for retirement or annuity benefits to pilots and/or copilots.

78 Cong.Rec. 4042.

Section 11 of S.3012 evolved into section 13 of the Air Mail Act of 1934 which provided:

> It shall be a condition upon the awarding or extending and the holding of any air-mail contract that the rate of compensation and the working conditions and relations for all pilots, mechanics, and laborers employed by the holder of such contract shall conform to decisions of the National Labor Board. This section shall not be construed as restricting the right of col-

lective bargaining on the part of any such employees.

48 Stat. 937–38 (1934).

In 1936 the coverage of the Railway Labor Act was extended to air carriers. 45 U.S.C. § 181 (originally enacted as Act of April 10, 1936, ch. 166, 49 Stat. 1189). The purposes of this Act are defined in section 2 thereof, 45 U.S.C. § 151a:

> The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

What is now section 401(k) of the 1958 Act first appeared in identical language as section 401(*l*) of the Civil Aeronautics Act of 1938, ch. 601, 52 Stat. 973, 990. Enactment of the section was proposed and urged by the Air Line Pilots Association and its president David L. Behncke.[5] The Act created the Civil Aeronautics Authority, 52 Stat. 980. Section 416(b)(1), 52 Stat. 1005, authorized the Authority under certain conditions to exempt carriers from the requirements of the Act.[6]

> (b)(1) The Authority, from time to time and to the extent necessary, may (except as provided in paragraph (2) of this subsection) exempt from the requirements of this title or any provisions thereof, or any rule, regulation, term, condition, or limitation prescribed thereunder, any air carrier or class of air carriers, if it finds that the enforcement of this title or such provision, or such rule, regulation, term, condition, or

---

5. Hearings on H.R. 9738 Before the House Committee on Interstate and Foreign Commerce, 75th Cong., 3rd Sess., at 209, 262 (1938); Hearings on S. 3659 Before a Subcommittee of the Senate Committee on Interstate Commerce, 75th Cong., 3rd Sess., at 65 (1938).

6. Sections 416(b)(1), (2), 52 Stat. 1005, provided:

Section 401(k) of the Federal Aviation Act of 1958, 49 U.S.C. § 1371(k),[7] repeated verbatim all the language of section 401(l) of the 1938 statute. Section 416(b) of the 1938 statute was also repeated in identical language in the 1958 Act except that "Board" was substituted in the text for "Authority", 49 U.S.C. § 1386(b).

Our problem is this: Section 401(a) of the Act provides that no air carrier shall engage in any air transportation without a certificate issued by the Board. Sections 401(k)(1) and (2) require "every air carrier" to maintain certain rates of compensation, maximum hours and other working conditions of pilots and copilots. Section 401(k)(4) conditions "the holding of a certificate by any air carrier" upon compliance with title II of the Railway Labor Act. Section 416(b)(1) authorizes the Board to exempt a carrier from the requirement of certification. Section 416(b)(2) prohibits the Board from exempting "any air carrier" from any provision of subsection (k) except that in specified circumstances the Board may exempt a non-scheduled air carrier and the daylight operations of a scheduled air carrier from the minimum wage provisions of sections 401(k)(1) and (2). The question is, may the Board by exempting a carrier from the requirement of certification free it from the requirement of section 401(k)(4) which in terms applies only to any air carrier "holding a certificate"?

On its face section 401(k)(4) applies only to air carriers holding certificates of public convenience and necessity. As the Board noted, this is in marked contrast to the provisions of sections 401(k)(1) and (2) which apply the minimum wage and maximum hour standards of the National Labor Board Decision No. 83 to "every air carrier". That the contrast was not inadvertent becomes clear when the text of the legislation originally proposed by the Air Line Pilots is examined. As proposed by President Behncke of the Air Line Pilots[8] and originally passed by the Senate[9] the bill conditioned the holding of a certificate upon compliance with Decision 83. When enacted however the statute applied the Decision 83 provisions to "every air carrier", without reference to the holding of a certificate. The distinction was brought sharply to the attention of Congress by Mr. Behncke in his 1938 testimony before the Senate Committee on Interstate Commerce. Replying to testimony by Edgar S. Gorrell, President of the Air Transport Association, Mr. Behncke submitted a statement which contained the following:[10]

Mr. Gorrell said:

(8) There are in this country today about 1,780 airplanes used in commercial business, and of that number the

limitation is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers and is not in the public interest.
(2) The Authority shall not exempt any air carrier from any provision of subsection (1) of section 401 of this title, except that (A) any air carrier not engaged in scheduled air transportation, and (B), to the extent that the operations of such air carrier are conducted during daylight hours, any air carrier engaged in scheduled air transportation, may be exempted from the provisions of paragraphs (1) and (2) of such subsection if the Authority finds, after notice and hearing, that, by reason of the limited extent of, or unusual circumstances affecting, the operations of any such air carrier, the enforcement of such paragraphs is or would be such an undue burden on

such air carrier as to obstruct its development and prevent it from beginning or continuing operations, and that the exemption of such air carrier from such paragraphs would not adversely affect the public interest: *Provided*, That nothing in this subsection shall be deemed to authorize the Authority to exempt any air carrier from any requirement of this title, or any provision thereof, or any rule, regulation, term, condition, or limitation prescribed thereunder which provides for maximum flying hours for pilots or copilots.

7.  Section 401(k) is set out in n. 3, *supra*.

8.  Hearings on S.3659, *supra* n. 5 at 53, 64, 94, 95.

9.  Petitioners' Brief at 17a.

10.  Hearings on S.3659, *supra*, at 94.

scheduled lines use only 447. Somebody flies those other 1,333 planes.

The pilots' answer:

The labor provision that the pilots are proposing applies only to air carriers holding certificates of convenience and necessity.

Again, in his testimony before the House Committee on Interstate and Foreign Commerce Mr. Behncke said [11]

Let us go on to paragraph (2) of the labor section we are proposing to be included in H.R. 9738, which reads as follows:

"It shall be a further condition upon the holding of a certificate by any carrier subject to this title that such carrier shall comply with title II of the Railway Labor Act, as amended."

One of the principal purposes behind this paragraph is to secure better compliance with the Railway Labor Act insofar as domestic carriers are concerned, but the principal purpose is to leave no doubt as to its applicability to. foreign operations, especially insofar as compliance is concerned. The reason for this is that our vast foreign air network starts and extends almost wholly beyond the borders of the United States. We all know that it is sometimes hard to secure compliance with a law of the United States when it applies to people and companies operating almost wholly beyond the borders of the United States. Therefore, the purpose of this paragraph (2) is to assure compliance with the Railway Labor Act by making it a condition of the certificate under which these foreign contractors will operate.

From all this we think the inference is clear that Congress was well aware of the distinction between certificate holders and air carriers in general, and acted advisedly when it limited the scope of section 401(k)(4) to those holding certificates.

The question naturally arises, why did Congress limit the sanction provided by

section 401(k)(4) to certificate holders? We think the petitioners in their brief have supplied the answer. As the petitioners point out (p. 25) at the time the Civil Aeronautics Act was passed in 1938 "no one could envisage any significant amount of air transportation being provided in the United States by any non-certificated carrier." The non-certificated carriers in those days were "essentially irregular, unscheduled operators, like the 'very small fry, who are, for the most part, constituted of one pilot and one airplane.'" (Br. p. 24). In the context of these facts Congress limited the duty of the Board to monitor compliance with the Railway Labor Act to cases involving substantial or "significant" carriers, to which the Board had issued a certificate. Pilots and other employees of the small and irregular carriers were remitted to their remedies under the Railway Labor Act, which of course applied to all carriers. The distinction drawn by Congress seems reasonable and understandable.

In the more than thirty-five years that have passed since the enactment of the Civil Aeronautics Act of 1938 the class of non-certificated air taxi operators has proliferated. See Air Line Pilots Association v. CAB, 161 U.S.App.D.C. 199, 202, 494 F.2d 1118, 1121 (1974); Hughes Air Corporation v. CAB, 160 U.S.App.D.C. 301, 303, 492 F.2d 567, 569 (1973). Perhaps it can be argued that the considerations which impelled Congress to limit the scope of section 401(k)(4) in 1938 no longer exist, and that the statute should be amended. This argument however should be presented to Congress, not to this court. We think Congress deliberately restricted the application of section 401(k)(4) and it is not for us to amend the statute by judicial fiat.

As we have said, the petitioners rely heavily on their interpretation of the legislative history of the Federal Aviation Act, as it appears in various congressional hearings. In particular the petitioners invoke the testimony of Pres-

11. Hearings on H. R. 9738 Before the House Committee on Interstate and Foreign Commerce, 75th Cong., 3rd Sess. at 237, 238 (1938).

ident Behncke before committees considering the bill which became the Civil Aeronautics Act of 1938. A reading of Mr. Behncke's testimony, however, discloses that he consistently focused on the minimum wage and maximum hour provisions of section 13 of the Air Mail Act of 1934, which became sections 401(*l*)(1) and (2) of the 1938 statute, and which are sections 401(k)(1) and (2) of the present Act. He insisted that the new legislation must give the pilots the protections of these provisions. As the petitioners say in their brief (p. 22) "the new law contained everything Behncke wanted". What the petitioners fail to make clear is that what "Behncke wanted" and said he wanted was the minimum wage and maximum hour protection now embodied in sections 401(k)(1) and (2). His testimony supported this thesis, not the proposition that section 401(k)(4) must apply to every air carrier. In short, the legislative history upon which the petitioners place such great weight will not bear it.

The petitioners assert that "In construing other provisions of the Act, the Board has interpreted the term 'certificate holder' to include exempt operators, and there is no basis for distinguishing those situations from the present case." (Br. p. 31) On this point the petitioners cite Mail Transportation by Noncertificated Carriers, 18 C.A.B. 201 (1953); Surface-Mail-By-Air Exemptions, 20 C.A.B. 658 (1955), aff'd sub nom. American Airlines, Inc. v. CAB, 97 U.S.App. D.C. 324, 231 F.2d 483 (1956). These mail pay cases however do not sustain the petitioners' claim. Section 406(a) of the Civil Aeronautics Act empowered the Board to fix fair and reasonable rates of compensation for the transport of mail by aircraft by each "holder of a certificate", and section 406(b) specified certain unique standards and factors to be taken into consideration in fixing such rates. The mail pay cases held that to the extent necessary to enable certain air carriers to participate in a one-year experiment being conducted by the Postmaster General the Board, under section 416(b), could exempt carriers from the requirement of certification and fix fair and reasonable rates for their services under ordinary public utility rate-making standards.[12] The Board said "[w]ere we to grant exemptions to the applicants herein, their authority to transport mail would be only permissive and could by no stretch of the imagination constitute them 'holders' of mail certificates or entitle them to all the compensatory benefits of certificate holders" including the right to receive subsidies and to require the Postmaster General to tender mail to them for transportation. 18 C.A.B. at 206, 202. Thus the Board did not hold that an exempt operator was the equivalent of a certificate holder.

In summary, we hold that the Board was correct in its conclusion that section 401(k)(4) "itself contains a built-in limitation upon its applicability."

The order of the Board is

Affirmed.

---

12. Two of the five members of the Board dissented.