**WORLD AIRWAYS, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Pan American World Airways, Inc., Intervenor.**

**No. 71–1225.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 18, 1971.

Judgment June 23, 1971.

Opinion Aug. 5, 1971.

---

3. (Tr. 49).

378

Mr. Frank J. Costello, Washington, D. C., for petitioner. Mr. Jerrold Scoutt, Jr., Washington, D. C., was on the brief for petitioner.

Mr. Ivars V. Mellups, Atty., Civil Aeronautics Board, with whom Messrs. R. Tenney Johnson, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, and Warren L. Sharfman, Associate Gen. Counsel, Civil Aeronautics Board, were on the brief for respondent. Mr. Howard E. Shapiro, Atty., Department of Justice, also entered an appearance for respondent.

Mr. Robert N. Duggan, Washington, D. C., was on the brief for intervenor.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

This case arises on a petition for review by World Airways, Inc. (hereinafter "World") of Civil Aeronautics

Board Order 71–3–91, which on March 16, 1971 granted Pan American World Airways, Inc. (hereinafter "Pan Am") an exemption and waiver to operate a series of 32 single-entity round trip passenger charter flights between various points in the United States and Athens, Greece, via Rome, Italy, during the period September 12 through November 13, 1971, for the Fedders Corporation (hereinafter "Fedders").[1] For the following reasons we affirm the order of the Civil Aeronautics Board (hereinafter "the Board") in granting an exemption.

On August 14, 1970, the Board revised Part 207 of its Economic Regulations and as a result many of the above-mentioned planned flights could no longer be flown by Pan Am under the amended regulations. Part 207.7a[2] of the regulations limits the frequency and regularity of off-route charter trips,[3] including off-route transatlantic charter trips. A transatlantic charter trip under the revised regulations is now defined as follows:

> Transatlantic charter trip means a charter trip between points within the 48 contiguous States of the United States, on the one hand, and points in Greenland, Iceland, the Azores, Europe, Africa, or Asia as far east as (and including) India, on the other hand: *Provided, however,* That this definition shall not apply to off-route charter trips performed by a carrier between a point within the 48 contiguous States of the United States, on the one hand, and a point in a country in the above area with respect to which the carrier is authorized to perform air transportation of persons and property pursuant to a certificate of public convenience and necessity issued under section 401 of the Act, on the other hand.

14 C.F.R. § 207.1 (1971). A study of this definition shows us that where a transatlantic charter trip is concerned the *area* of the 48 contiguous states and Europe are regarded as separate *points* for the purposes of the frequency restrictions contained in Part 207.7a. Immediately prior to the August 14 revision Pan Am had been specifically excepted in the regulations from the more restrictive effect of falling within the definition of a "transatlantic charter trip"

---

1. Fedders' desire for air transportation comes as a result of its sales incentive charter programs. Pan Am has provided its service to Fedders for these programs on eighteen prior occasions from 1954 through 1970. (J.A. 11.)

2. § 207.7a Restriction on frequency and regularity of off-route charter trips and other special services:

   No air carrier shall perform off-route Hawaiian, transatlantic or transpacific charter trips, or any other off-route charter trips between any pair of points, or special services between any pair of points.
   (a) In excess of a total of eight (8) flights in the same direction during any period of four successive calendar weeks,
   (b) In the same direction on the same day of two or more succesive calendar weeks,
   (c) In excess of a total of three (3) flights in the same direction during any period of two successive calendar weeks unless such period is followed by a break of at least one calendar week during which no flights are operated in such market or between such points,
   (d) Which are so arranged as to result in the observance of breaks required by paragraph (c) of this section at regularly recurring intervals, or
   (e) Which are so arranged as to result in any uniform pattern or normal consistency of operations:
   *Provided,* That the restrictions imposed by this section shall not be applicable to off-route cargo charters performed by an all-cargo carrier within its area of operations as set forth in § 207.6.
   14 C.F.R. § 207.7a (1971).

3. An "off-route" charter trip for the purposes of this case refers to one which is performed by an air carrier between points between which said carrier is not authorized to provide service pursuant to either its certificate of public convenience and necessity or exemption authority. Air carriers, other than the supplemental air carriers, are allowed to perform off-route charter trips *under regulations prescribed by the Board. See* 49 U.S.C. § 1371 (e) (6) (1964).

since it was certificated to serve the areas involved.[4]

The current definition of a "transatlantic charter trip" makes no such exception for Pan Am, but excepts only those charter trips where the particular carrier is certificated to serve the particular *country* within the general area. Though Pan Am is certificated to serve between several points in the United States and Rome, it is not authorized under its certificate to serve any point in Greece. Since Pan Am does not hold such authority, the charter trips to and from Athens are subject to the more restrictive *area* frequency limitations. As a result, if Pan Am operates all of the 32 flights in the program, it will exceed the frequency limitations imposed by the regulations unless it is granted an exemption or a waiver from these restrictions.

■ On December 28, 1970, Pan Am applied to the Board for an exemption pursuant to section 416(b) of the Federal Aviation Act of 1958 (hereinafter "the Act"), 49 U.S.C. § 1386(b) (1964), from operation of the revised August 14 regulations with respect to the previously planned 32 flights. Section 416(b) provides in pertinent part:

> The Board, from time to time and to the extent necessary, may * * * exempt from the requirements of this subchapter or any provision thereof, or any rule, regulation, term, condition, or limitation prescribed thereunder, any air carrier or class of air carriers, if it finds that the enforcement of this subchapter or such provision, or such rule, regulation, term, condition, or limitation is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations

of such air carrier or class of air carriers and is not in the public interest. 49 U.S.C. § 1386(b) (1) (1964). Pan Am's application for exemption was formally opposed before the Board by six carriers, one of whom is our present petitioner, World Airways, Inc. Each of the objecting carriers had the necessary operating authority to perform the charter flights. After considering the pleadings and arguments presented by both sides, the Board granted Pan Am's request for an exemption. It is the task of this court to determine whether the Board acted within its power and authority in granting the exemption. We must be convinced that upon the record before it the Board acted reasonably. *American Airlines v. CAB*, 98 U.S.App. D.C. 348, 354, 235 F.2d 845, 851 (1956). Furthermore, it is not the prerogative of this court to substitute its judgment for that of the Board's on issues the Board has resolved in a rational manner. (*Id.*)

■ As can be seen from reading section 416(b) (1), *supra*, the Board must make essentially three supported findings before granting an exemption. It must find first that the operations of the carrier are either of "limited extent" or affected by "unusual circumstances." It then must find that because of such "unusual circumstances" enforcement of the particular regulations would impose an "undue burden" on the carrier. Having found the above two conditions present the Board must further find that enforcement of the regulation would not be in the "public interest." It must be remembered that the agency is required to make findings upon which its order is grounded, so a reviewing court may adequately determine the basis of an agency's conclusion. 49 U.S.C. § 1485(f) (1964); *American Airlines v. CAB, supra*, 98 U.S.App.D.C. at 356, 235 F.2d

---

4. At that time a "transatlantic charter trip" was defined as a charter trip between points within the 48 contiguous States of the United States, on the one hand, and points in * * * Europe,

* * * performed by any carrier *other than Pan American World Airways, Inc.* * * *. *See* 14 C.F.R. § 207 (1970). (Emphasis added.)

at 853. As this court has noted, the Board in the past has not paid sufficient heed to its duty to meaningfully relate its findings to its conclusions. *See* Kodiak Airways, Inc. v. CAB, 144 U.S.App. D.C. ——, at ——, 447 F.2d 341, at 356 (1971). This is somewhat of a problem in this case, and though not of decisional significance here, the Board could very easily have been (and we so urge it to be in the future) a bit more meticulous in coordinating its findings with its conclusions.

■ The Board's finding here with respect to the existence of "unusual circumstances" is reasonable and supported by the record. The Board found that Pan Am and Fedders had entered into contract negotiations some four months prior to the January 7, 1970 notice (35 Fed.Reg. 466 (1970)) proposing to amend Part 207. The Board also found that Fedders and Pan Am reached agreement on July 24, 1970, although the formality of signing the contract was not accomplished until August 19, 1970, five days after the revised regulations were adopted. In light of these findings and the evidence supporting them, we think the Board, at least in this case, acted within its discretion in holding, in effect, that it is an "unusual circumstance" when agreements that are negotiated and completed in *good faith* and with the endorsement of existing law become invalid because of a regulatory change that did occur, but presumably may very well have not. To have required Fedders and Pan Am to have ceased bargaining negotiations and to have further required them to refrain from making *good faith*

agreements because of mere agency proposals could arguably have been considered by the Board an unusual requirement.

■ The Board's finding of "undue burden" is also supported by the record. If Pan Am were unable to perform this contract it would lose $1,339,608, the total charter price, in revenue.[5] This is even more burdensome in view of the fact that Pan Am had expended much valuable time at great expense in not only working out the flight schedules, but also in planning ground arrangements for the charters, which involved some 6,000 participants. Pan Am most likely would have been able to make other commitments in the market place for its aircraft had it not negotiated with Fedders. What makes this burden undue or inappropriate is that it would be suffered, the Board found, because of good faith reliance upon existing and controlling law.

■ We must now examine the Board's conclusion that enforcement of the regulatory restrictions in this case would not be in the "public interest." As the Board here apparently reasoned, it certainly would not be in the "public interest" nor in accord with the "public convenience" (*see* 49 U.S.C. § 1302 (1964)) to deprive Fedders of a choice it arrived at only after considered negotiations with four possible air carriers. It claims "[s]uch selection was made not only on a basis of price but in light of the long and satisfactory association [it] has had with Pan Am." (J.A. 37.) It is apparent that the Board believed Fed-

---

5. Petitioner in its brief relies on Pan American World Airways v. CAB, 104 U.S.App.D.C. 288, 261 F.2d 754 (1958), for the proposition "that deprivation of revenue, even to a carrier in financial distress, does not amount to an undue burden." (Brief for Petitioner at 13.) In that case, however, the court merely held that *without more* financial distress is not enough to merit a section 416(b) exemption. The court said:

  Of course an unusual circumstance which causes final [*sic*] distress may be

such a circumstance as to warrant relief under this exemption provision. But financial distress *in and of itself, unrelated to circumstances* which would render the carrier eligible, is not enough. (*Id.* at 757–758) (Emphasis added.) In *Pan American* the court found no "unusual circumstance" which could be said to have made the financial burden an "undue" one.

ders' assertion that disruption of the "good faith" arrangements made for 6,-000 people "would create significant inconvenience, uncertainty and expense for Fedders." (*Id.*) In view of the number of flights and people involved, petitioner's contention that "carrier substitution could be achieved simply through a novation of the existing contract" (Brief for Petitioner at 16) seems to be without merit. In determining what is in the "public interest" the Board is also required by statute to keep in mind the "foster[ing] of sound economic conditions" and "the sound development of an air-transportation system." *See* 49 U.S.C. § 1302(b), (d) (1964). To expect carriers and customers not to trust the continued vitality of existing law and to conduct themselves under the influence of mere agency proposals is something the Board may reasonably consider not to be conducive to the "foster[ing] of sound economic conditions" and "the sound development of an air-transportation system." We thus find the Board's finding on the "public interest" question to be a rational one and not arbitrary.

■ Petitioner makes the further argument that the very purpose of the frequency and regularity restrictions is frustrated by the granting of an exemption to Pan Am to perform 32 round trip flights into the heart of the prime Eastern Mediterranean market during an eight-week period. It is true that the "Part 207 restrictions are intended to protect the primary charter markets of the supplemental carriers, the charter specialist" (Brief for Petitioner at 16); however, the overriding public interest in this case was to allow the performance of an agreement validly made in good faith. The Board here was not abandoning a general policy of affording protection to the supplementals, but was merely staying the operation of its regulations with respect to only the Fedders-Pan Am charter contract.

In view of the foregoing we affirm the Board's order granting Pan Am's application for an exemption; we find it unnecessary, then, to consider the propriety of the Board's *sua sponte* action in granting a waiver.

Affirmed.