494 F.2d 1118
 85 L.R.R.M. (BNA) 2702, 161 U.S.App.D.C. 199
 AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent (two cases), Delta Air
Lines, Inc., Intervenor.
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Texas International
Airlines, Inc., Intervenor.
 Nos. 73-1068, 73-1069 and 73-1173.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Jan. 10, 1974.
Decided March 20, 1974.
 
 Gary Green, Washington, D.C., for petitioner.
 Glen M. Bendixsen, Atty., C.A.B., for respondent. O. Z. Ozment, Acting Gen. Counsel, C.A.B., Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, C.A.B., at the time the brief was filed, Robert L. Toomey and Ivars V. Mellups, Attys., C.A.B., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief for respondent. R. Tenny Johnson, Gen. Counsel, C.A.B., at the time the record was filed, also entered an appearance for respondent.
 Robert Reed Gray, Washington, D.C., was on the brief for intervenor Delta Air Lines, Inc.
 Before BAZELON, Chief Judge, and WRIGHT and TAMM, Circuit judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 In these consolidated cases the Air Lines Pilots Association, International seeks review of three orders of the Civil Aeronautics Board authorizing temporary suspensions of service between specified points by certain certificated[1] air carriers.[2] The authorizations are all conditioned upon provision of replacement service by particular carriers, termed air taxis or commuters, which have been exempted from certification.[3] This court previously considered an earlier Board approbation of the temporary suspensions with which the challenged order in No. 73-1068 is principally concerned. See Air Line Pilots Assn, International v. CAB, 148 U.S.App.D.C. 24, 458 F.2d 846 (1972) (hereinafter ALPA I). Our previous consideration resulted in a remand to the Board to determine whether the exemption of the replacement carriers could continue in effect 'given the changes in their operations that are contemplated by the orders.' 148 U.S.App.D.C. at 27, 458 F.2d at 849. We find that the Board has made such a determination and that this determination was rational and within the Board's discretion. We further find that the Board gave sufficient opportunity to ALPA to argue for inclusion in the new authorization order of provisions protective of the carrier employees affected by the suspensions, and that the Board's decision not to include such provisions was also within its discretion.[4] Inasmuch as our disposition of No. 73-1068 settles any issue raised by ALPA relevant to Nos. 73-1069 and 73-1173, we need not consider 73-1069 and 73-1173 separately.[5]
 
 
 2
 * The authorizations of the temporary suspensions challenged here were all granted by the Board in response to the problem posed by short-haul, low-density routes in certificated carrier systems. At least partially because of certificated carriers' shift to larger, technologically advanced equipment, these markets, which were never more than marginally profitable, have become an increasing economic burden on the carriers. As a result, the certificated carriers have been cutting back their short-haul operations to the minimum level of adequacy permitted by their certificates and have been receiving substantial amounts of subsidy from the federal treasury. In addition the CAB has permitted the carriers to delete some of their especially burdensome routes from their certificates. No. one-- not the small communities served by these markets, not the certificated carriers, not the taxpayers-- has been benefitted by these developments.
 
 
 3
 Another development in the air carrier industry has provided the Board with a means to address the short-haul market problem. That development has been the proliferation of 'air taxi operators,' a class of carriers exempt from most of the Federal Aviation Act's regulatory provisions, including the certification requirement, by virtue of the relatively small size of the aircraft which they employ.[6] The exemption for air taxi operators was first adopted by the Board in 1952 pursuant to its authority to relieve carriers from the requirements of the Act when it finds that enforcement of the provisions from which exemption is granted (1) would be an 'undue burden' on a carrier or class of carriers 'by reason of the limited extent of, or unusual circumstances affecting, the operations' of the carrier or class of carriers, and (2) would 'not (be) in the public interest.' 49 U.S.C. 1386(b)(1).[7] The exempt air taxi operators have competed effectively with certificated carriers in many short-haul, low-density markets. Their smaller aircraft have enabled them to provide more frequent and better timed service. Many provide 'commuter' round trip service between two or more points which certificated carriers cannot match. Because of their exempt status, the air taxis have been able to change routes and schedules without a Board hearing and thus have responded quickly to changing demand patterns.
 
 
 4
 The Board decided that substitution of air taxi for certificated service would benefit not only taxpayer and certificated carrier budgets, but also the small communities whose needs the air taxis can more adequately meet. The Board has therefore entered a number of orders authorizing certificated carriers to suspend service at certain points which could not support a certificated carrier's service on an economically sound basis and at which service was or would be provided by air taxis. Such suspensions usually have been conditioned upon provision of a specified level of service by an air taxi. The Board has termed conditional suspensions 'a middle course between wholesale deletion, on the one hand, and a combination of subsidy funding and losses by the certificated carriers at an unreasonable level, on the other hand.'[8] Our previous opinion in this case resulted from ALPA's appeal from three of the Board's early orders approving conditional suspensions. These three orders rested simply on the Board's findings under Section 401(j) of the Act, 49 U.S.C. 1371(j), that the suspensions were required by the public interest. We held in ALPA I that such findings were not sufficient, that where the Board bases a suspension of certificated service on the substitution of non-certificated service the Board must reexamine and make new findings on the exempt status of the substitute carrier. More specifically, the ALPA I court remanded the cases before it to the Board for findings on the issues raised by the Act's exemption provision: '(1) whether certification would be an undue burden on the carriers, and (2) the public interest in certification in these circumstances * * *.'[9]
 
 
 5
 On September 12, 1972, in response to this court's remand, the Board issued an order to show cause setting forth tentative findings concerning the three previously challenged suspensions and two other theretofore unreviewed suspension agreements.[10] The order tentatively found not only that all the suspensions were in the public interest, but also that the involved substitute carriers should maintain their exempt status. The order further concluded that labor protective provisions should not be imposed on any of the certificated carriers whose suspensions were approved. All interested parties were directed by the order to show cause why the tentative findings and conclusions should not become final. They were invited to support any objection with statistical data or other evidence they deemed relevant. Interested parties who desired a full evidentiary hearing on the order were further directed to state in detail why such a hearing was necessary and what facts they would there attempt to establish. In reaching its tentative conclusions, the show cause order explained at length the Board's general position on the 'public interest' and 'undue burden' exemption issues on which the ALPA I court directed the Board to make findings. The order then related this position to the specific suspensions with which it was concerned.
 
 
 6
 ALPA filed objections to finalization of the show cause order, arguing that the Board's general position on the exemption was incorrect, that an evidentiary hearing should in any case be held on this issue, and that the Board's proposed disposition should have at least imposed provisions protective of the certificated carrier employees affected by the suspensions. On January 2, 1973, however, the Board issued an order making final its tentative findings.[11] The order found ALPA's objections to the Board's position on the exemption issue to be principally ones of law and policy which the Board could reject without an evidentiary hearing.[12] The order further concluded that the Board could dismiss ALPA's objections to the findings on the labor protective issue without a full-scale evidentiary hearing because 'ALPA * * * has failed to offer any facts to substantiate its claims that protective provisions are required.'[13] It is from this order that ALPA appeals in No. 73-1068.[14]
 
 II
 
 7
 ALPA's primary challenge is directed toward the Board's finding that the carriers providing the air taxi replacement service should continue to be exempt from most of the economic regulatory provisions of the Act. At the outset we note that ALPA is foreclosed from arguing on this appeal that, regardless of its rationale or evidentiary basis, the CAB is restricted by the Act from permitting an exempted carrier to provide service over a particular route in place of a certificated carrier. We held in ALPA I that the CAB was to reconsider a replacement carrier exemption when it substantially took over a route of a certificated carrier. It is a necessary corollary of this holding that the CAB can legally make findings which, in some circumstances at least, justify permitting such a replacement carrier to continue its exempt status. If the ALPA I court had thought that continuing the exemption for a replacement carrier was prohibited by the Act and consequently beyond the discretion of the CAB, it would have decided the case without a remand. Therefore, all that ALPA I leaves for us to determine on this issue is whether the Board's decision to continue to exempt the replacement carriers here was a rational one[15] supported by substantial evidence.[16]
 
 
 8
 We turn to this task. Inasmuch as ALPA attacks only the Board's general position that air taxi operators which participate in suspension-substitution agreements should continue to be exempted rather than the Board's application of this position to specific suspensions, we shall confine our review to the Board's general findings. As stated above, the ALPA I court asked the Board to make findings on each of the issues upon which exemption is to hinge under the statute: (1) whether certification would be an undue burden on the replacement carriers by reason of the limited extent of, or unusual circumstances affecting, their operations, and (2) whether certification is not in the public interest. Because in this case at least the 'undue burden' issue is logically anterior to the 'public interest' issue, we shall consider the undue burden issue first.
 
 A.
 
 9
 The Board's findings on the 'undue burden' issue were based primarily on its recent opinion in Part 298 Weight Limitation Investigation, CAB Order 72-7-61 (July 18, 1972), which we upheld in Hughes Air Corp. v. CAB, 160 U.S.App.D.C. , 492 F.2d 567 (1973). Order 72-7-61 resulted in promulgation of an amendment to the CAB regulation which provides air taxi operators with their general exemption. The amendment increases the size of the aircraft the air taxi operators can employ without losing their exempt status. In consideration of the amendment, the Board concluded that regardless of increased aircraft size 'certification requirements would be an undue burden on air taxis, as a class, by reason of the limited extent of, and unusual circumstances affecting, their operations.'[17] The Board stressed the small size of the air taxi operators and their operations relative to the certificated carriers. It found that most of the air taxis were operating at a loss or at a level of only marginal profitableness and that firms enter and leave the industry at a high rate. Noting that the cost of one not extraordinary proceeding in which a former air taxi gained certification was $50,000, the Board found that certification would impose a significant financial strain upon air taxis. The Board in the Part 298 case further found that the unusual circumstances affecting air taxi operations-- high-risk, short-haul, low-density markets in which surface transportation may offer serious competition-- would make certification especially burdensome. In order to stay economically viable air taxi operators need to initiate, alter or discontinue service without the delay and costs of a formal hearing to amend their certification before the CAB.
 
 
 10
 We upheld these findings in Hughes; we think they offer adequate support for the Board's resolution of the undue burden issue in the order we review today. The Part 298 findings are not less significant for this case because of any change in air taxi operations contemplated by the order under review. The short-haul, low-density, at least relatively unprofitable routes on which the air taxi operators provide replacement service under this order constitute the precise unusual circumstances which the Board found in the Part 298 case would make certification an undue burden. Nor is there any indication that the replacement service here challenged will enable the exempt carriers to increase appreciably the limited extent in terms of size and profitableness of their operations. If certification would have been a financial strain on a commuter carrier before it entered into a suspension-substitution arrangement, it is certainly rational to conclude that it would impose a strain after such an arrangement. It is true, as ALPA points out, that the ALPA I court stated: 'It is unlikely that service which is the subject of certification can be service of a 'limited estent' within the meaning of the statute.'[18] If so, it of course could not be performed by an exempt carrier. But as the Board's order explains,[19] the routes involved in suspension-substitution arrangements have not been independently certificated. They are ordinarily part of a much larger system which includes some very profitable long-haul routes. The fact that the certificated carriers which foremerly provided the suspended services do not have 'limited' operations does not mean that substitute air taxi operations are not limited in extent.
 
 
 11
 If an air taxi operator providing replacement service becomes sufficiently large and economically viable and free of the general uncertainties of short-haul, low-density markets, the Board can always determine that its exemption from certification is no longer necessary. Indeed, the Board's order recognizes 'that the certification of former air taxis may well be desirable in individual circumstances' and cites two cases in which it has required certification of air taxis.[20] After individualized consideration, however, the Board found that all air taxi operators providing substitute service in the five cases before it should continue to be exempt. Since, as stated, these individual determinations were not criticized by ALPA we need not give them specific review.
 
 B.
 
 12
 Though the Board considered the 'public interest' issue first, its public interest findings rested in an important respect upon its undue burden analysis. In finding exemption to be in the public interest, the Board reasoned that the suspension-substitution arrangements provide small communities, the federal treasury, and certificated carriers with important benefits and that these arrangements would be jeopardized by requiring the replacement carriers to obtain certification. The Board quoted from the Hughes-affirmed Part 298 case in support of its view that the air taxi operators, 'functioning at a relatively high financial risk,' must have 'the maximum possible operational flexibility' and thus cannot and should not be burdened by certification.[21]
 
 
 13
 We held in Hughes that it was at least a rational inference for the Board to conclude from its findings on the burden of certification that if the air taxi operators had to choose between using larger, more efficient aircraft and exemption, they would choose the latter.[22] We hold today that it was also rational for the Board to conclude that air taxis would probably not be willing and able to provide substitute service if this provision meant losing their exemption. The routes on which the certificated carriers desire to suspend service do not differ from the general short-haul, lowdensity routes for which the air taxis' continuing exemption was approved as necessary in Hughes. Air taxis were operating under their exemptions on many of the suspended routes even before the certificated carriers sought suspensions. As indicated above, the Board's earlier inclusion of these routes in the route system of a certificated carrier does not prove that these routes would independently support certification. It was rational for the Board to conclude that they would not.[23]
 
 
 14
 Having upheld the Board's finding that the benefits to be derived from the suspensions would be threatened by revocation of the air taxi exemptions, we have no difficulty in rejecting ALPA's argument that it was inappropriate to consider these benefits as relevant to the public interest in exemption. We did state in ALPA Ithat the public interest in certification of services is distinct from the public interest in having these services provided,[24] but our Hughes opinion made clear that, where provision of the services may be dependent upon exemption, the benefits to be derived from the services are relevant to the public interest in exemption.[25] ALPA does not question the Board's findings that the sustitution-suspension arrangements will improve services to the small communities affected, reduce the burden on the federal treasury of subsidies to certificated carriers, and benefit the economic position of certificated carriers.[26] The Board's conclusion that certification would adversely affect the public interest by jeopardizing these benefits was surely a rational one.[27]
 
 
 15
 We further do not find merit in ALPA's contention that the Board failed adequately to deal with three alleged disadvantages of exemption in its consideration of the 'public interest.'[28] Two of these alleged disadvantages-- the instability of air taxi operations and their generally higher fares-- were addressed and quite properly discounted by the Board in its final order's discussion of ALPA's objections to the show cause order. The Board stated that the relative stability of air taxi operations was not a relevant consideration because under each of the approved suspensions the certificated carrier remains obligated to provide its previous service whenever the air taxi fails to provide the agreed upon minimum level of service.[29] The higher fares generally charged by the air taxis were deemed by the Board relevant to the public interest in exemption vel non, but were overweighed by the benefits of the suspension-substitution arrangements.[30] Inasmuch as the lower fares of certificated carriers are made possible by subsidies from the average American taxpayer and from passengers on longer flights who, though Board-approved higher rates, effectively compensate the certificated carriers for the money they lose on short hauls,[31] we think the Board's weighing of this factor was well within its discretion.
 
 
 16
 The Board's statement of its general position on exemption of replacement carriers did not address ALPA's third alleged disadvantage of exemption-- that the service of the air taxis is not as safe as that of the certificated carriers. Instead in its individualized consideration of each of the suspensions the Board noted that it had determined from inquiries at the Federal Aviation Administration that the replacement carrier had conducted its operation in accordance with the applicable FAA safety regulations and concluded that, given the FAA's ongoing regulation of airline safety, there were no safety considerations which warranted finding the arrangement contrary to the public interest. This treatment of the safety issue was not an abuse of the CAB's responsibility. The Federal Aviation Act of 1958 relieved the Board of primary responsibility for safety regulation, placing that responsibility instead upon the FAA, see 49 U.S.C. 1421, 1341 (1970). The FAA has fulfilled the responsibility by imposing detailed safety regulations upon air taxi operators as well as certificated carriers. See 14 C.F.R. Part 135 (January 1, 1973). At least where, as here, there is no evidence to contravene the FAA's opinion that a replacement carrier has operated safely within the regulations,[32] the CAB is entitled to rely on such an opinion.[33]
 
 
 17
 In sum, we conclude that the Board's findings that the replacement air taxi operators should continue to be exempted under the Part 298 regulations were rational and well within the Board's discretion to implement the Act. We therefore uphold the Board's authorization of the temporary suspensions of certificated service conditioned on provision of substitute service by exempt carriers.
 
 III
 
 18
 ALPA contends, however, that even if the air taxi exemptions and the conditional suspensions are proper, the Board should have included in its order provisions protective of the certificated carriers' employees, or at least should have held full evidentiary hearings to determine the need for such provisions. In arguing that the Board should have held full hearings, ALPA relies principally on a statement in our ALPA I decision 'that if the Board concludes * * * that the exemptions of the non-certificated carriers remain valid * * *, it should then conduct hearings on the need for protective labor conditions * * *.' 148 U.S.App.D.C. at 30, 458 F.2d at 852. The Board did not interpret this language to require a full-scale evidentiary hearing similar to the kind prescribed by the Administrative Procedure Act for cases of 'adjudication required by statute to be determined on the record after opportunity for an agency hearing,' 5 U.S.C. 554 (1970). Instead it determined that the ALPA I court's reference to a hearing meant that the Board was to employ those fair procedures which it deemed appropriate for collection of the evidence necessary to a resolution of the labor protective provision issue. We first review the Board's interpretation of our prior opinion with respect to the procedures it was to follow in resolving the labor protective provision issue before considering the merits of the Board's order.
 
 A.
 
 19
 A mere reading of the above quoted language might well lead us to agree with ALPA that the Board misinterpreted our prior opinion. However, considering that language in the context of the entire opinion and the further proceedings in this case enables us to approve the Board's position that it was not required to hold full-scale hearings.
 
 
 20
 We first note, as did the Board in deciding not to employ full-scale hearing procedures,[34] that this court has refused to import a full-scale hearing requirement into any of the statutory provisions pursuant to which the Board acted in this case-- Section 416, 49 U.S.C. 1386, under which exemptions may be issued,[35] Section 401(j), 49 U.S.C. 1371(j), under which certificated operations may be temporarily suspended,[36] or Section 412, 49 U.S.C. 1382 (1970), under which agreements between air carriers are approved.[37] Moreover, we recently held in another ALPA case, Air Line Pilots Assn, International v. CAB, 154 U.S.App.D.C. 316, 322, 475 F.2d 900, 906 (1973), that the Board had discretion to determine whether to hold a hearing on labor protective provisions before approving a multilateral schedule reduction agreement. The Board has indeed regularly denied requests to impose labor protective provisions without holding full-scale hearings.[38]
 
 
 21
 To be sure, ALPA's principal argument is not that full-scale hearings on labor protective provisions must be held in every exemption or suspension case, but that such hearings were required in this particular case because our prior opinion specifically so directed. However, the ALPA I court's stated reason for finding the case before it somewhat special with respect to this issue suggests that it did not intend to carve out an exception to the general law. The court asserted that since 'the agreements have been in effect for a substantial period prior to the issuance of this opinion, * * * there should be hard evidence on which to make a determination' on the labor protective issue.[39] The court's stated concern in making reference to a hearing was that this evidence be considered, that 'ALPA * * * be entitled to demonstrate that a need for protective conditions exists.'[40] We think the Board's liberal interpretation of the ALPA I court's hearing reference was not unresponsive to the court's concern.
 
 
 22
 We also cannot ignore the fact that the Board gave notice of its liberal interpretation of the hearing requirement in a petition to the ALPA I court to clarify its opinion on this point.[41] Though not dispositive, the court's decision to decline clarification in the face of this notification is a factor in our affirmance of the Board's interpretation.[42]
 
 B.
 
 23
 We turn next to the Board's actual consideration of whether labor protective provisions should be imposed on the suspensions. We must determine whether the Board resolved this issue within its discretion after employing fair procedures which, in accordance with our prior opinion's directive, gave ALPA an opportunity 'to demonstrate that a need for protective conditions exists.' In order to make this determination, it is necessary to set forth the legal basis for the Board's discretion to impose these provisions and the manner in which the Board has exercised this discretion in the past.
 
 
 24
 The Board first conditioned its approval of a change in a carrier's certificate on the carrier's agreeing to provide some protection to adversely affected employees in United-Western, Acquisition of Air Carrier Property, 11 CAB 701 (1950). The Board in United-Western acknowledged that it had no express statutory authority to impose such conditions, but nonetheless found implicit in the Act a completely discretionary power to 'impose conditions for the benefit of adversely affected employees in cases involving route transfers, acquisitions, and mergers * * *.'[43] The Board explained that beyond the interest of employees in labor protective provisions there is an important general public interest in insuring that 'route transfers and mergers' which are otherwise desirable 'not be prevented or delayed by labor difficulties arising out of hardships to employees * * *.'[44] The Board's power to impose labor protective provisions under the United-Western precedent and the discretionary nature of this power were approved by this court just last term. See Air Line Pilots Assn, International v. CAB, supra, 154 U.S.App.D.C. at 321, 475 F.2d at 905.
 
 
 25
 The Board has exercised its labor protective discretion almost exclusively in cases which, like United-Western, involved route transfers, acquisitions, or mergers with a clear impact on a certificated carrier's entire system. In these cases the Board has presumed, even in the absence of any definite evidence, that there will be sufficient impact on employees to impose protective provisions.[45] In cases like the instant one, involving temporary certificated carrier suspensions on particular routes, the Board has been much more restrained in the use of its labor protective power, declining to impose provisions 'unless the need therefor is clearly demonstrated.'[46] The Board has imposed provisions in only one suspension case, Seven States Area Investigation, 30 CAB 473 (1960), after an 'affirmative showing' was made 'that the suspensions and deletions * * * are likely to cause substantial employee dislocation * * *.'[47] The Board has recently continued to adhere to its policy of restraint in suspension cases, stressing the strong affirmative showing that was made in Seven States and that the latter case effectively involved a basic transformation in a certificated system.[48] The Board has grounded its special treatment of suspensions on its determination that a suspension of a particular route or routes, unlike a merger, will not normally substantially affect employees and thus will not threaten airline labor strife. It has further distinguished suspensions by noting that labor protective provisions might 'tend to nullify one of the principal benefits of suspensions, i.e., the reduction in costs which the carrier will experience.'[49] We think the Board has thus developed a rational policy for the exercise of its discretionary labor protective power.
 
 
 26
 Having made this determination, it merely remains for us to review whether the Board's refusal to exercise its labor protective power in this case was consistent with its rationally developed policy[50] and the ALPA I decision as we read it. Thus we must only determine that ALPA was given adequate opportunity to make an affirmative showing that 'a need for protective conditions exists,' ALPA I, supra, 148 U.S.App.D.C. at 30, 458 F.2d at 852, and that the Board rationally concluded that ALPA had not made such a showing. We have no difficulty making these determinations.
 
 
 27
 Under its interpretation of our prior opinion, the Board, as stated above, decided to commence the proceedings on remand by publication of a show cause order setting forth its tentative findings on the exemption and labor protective provision issues. Any interested parties having objections to making the tentative findings final were directed by the order to submit a 'statement of objections together with such statistical data, and other materials and evidence relied upon to support the stated objections.'[51] In addition interested parties who requested an evidentiary hearing were told to 'state in detail why such a hearing is necessary and what relevant and material facts he would expect to establish through such a hearing.'[52] ALPA was thus given fair notice that its reply to the show cause order should either make an affirmative showing that employees had been substantially affected or indicate how it would make such a showing at an evidentiary hearing. The Board concluded in its order making final the tentative findings that ALPA had done neither.
 
 
 28
 ALPA apparently argued in its response to the show cause order that the Board should impose labor protective provisions on the basis of statistics which showed a decline in the number of pilots employed by the two carriers-- Mohawk Airlines and Northeast Airlines[53] -- whose suspensions were at issue in ALPA I.[54] The Board had specifically discussed the available data on both the Mohawk and the Northeast labor situations in its show cause order and it found that ALPA's response offered no evidence or lines of analysis which it had not previously considered. The Board noted that the personnel forms filed at the CAB by Mohawk from which ALPA's statistics were derived showed that there was no decrease in Mohawk's pilot or overall employment for the period directly following approval of the suspensions. The drop in Mohawk's reported pilot employment came almost a year and a half after the suspensions and immediately after an ALPA strike at Mohawk.[55] The Board stressed that the drop in Northeast's employment coincided with Northeast's substantial reduction of schedules in certain Florida and other non-New England markets.[56]
 
 
 29
 The Board found no evidentiary support in ALPA's response for any finding that the Northeast suspensions approved in the orders on review here caused the 'substantial employee dislocation' upon which imposition of protective provisions in Seven States was based. In the absence of any analysis from ALPA as to how it could prove at a full evidentiary hearing some 'substantial employee dislocation' from the challenged limited suspension orders, the Board declined to hold such a hearing. In its show cause order the Board acknowledged knowledged that the challenged Northeast suspensions were part of a general pattern of suspensions of service by that carrier in New England, but pointed to the evidentiary hearing in New England Service Investigation, wherein the Board is undertaking a complete review of small community service in New England, as an appropriate forum to consider any cumulative labor impact of past and planned Northeast reductions. The Board cited ALPA's failure in the New England hearing to make any showing of substantial impact, and indeed ALPA's failure to even enter an oral appearance, as support for its view of the futility of evidentiary hearings on the limited particular suspensions being reviewed.
 
 
 30
 ALPA makes the same arguments for imposition of labor protective provisions, based on the same general evidence, before this court as it made before the Board. It does not suggest to us what more it would attempt to prove at an evidentiary hearing; indeed it asks us on the basis of its assertions to order imposition of labor provisions without a full hearing. In some cases a full evidentiary hearing before the Board on the labor protective provision issue would no doubt be necessary, but we cannot say that in this case the Board's decision to make its tentative findings on the labor protection issue final without an evidentiary hearing was unreasonable. The suspensions in Seven States involved a basic transformation in a certificated system; it was rational for the Board to conclude that no showing was made or could be made at an evidentiary hearing that the suspensions here involved resulted in the same substantial employee dislocation.[57]
 
 
 31
 We therefore find ALPA's challenges to the Board's order on both the exemption and the labor protective provision issues to be without merit.
 
 
 32
 Affirmed.
 
 
 
 [1]
 49 U.S.C. 1371(a) (1970) states:
 No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation.
 
 
 [2]
 49 U.S.C. 1371(j) (1970) provides, in pertinent part:
 * * * The Board may, by regulations or otherwise, authorize such temporary suspension of service as may be in the public interest.
 
 
 [3]
 49 U.S.C. 1386(b)(1) (1970) provides, in pertinent part:
 The Board, from time to time and to the extent necessary, may * * * exempt from the requirements of this subchapter or any provision thereof * * * any air carrier or class of air carriers, if it finds that the enforcement of this subchapter or such provision * * * is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers and is not in the public interest.
 
 
 [4]
 We have jurisdiction by virtue of 1006(a) of the Federal Aviation Act of 1958, 49 U.S.C. 1486(a) (1970)
 
 
 [5]
 See note 14 infra
 
 
 [6]
 See 14 C.F.R. Part 298 (Jan. 1, 1973)
 
 
 [7]
 The air taxi operator exemption was amended by the Board in 1972 to permit air taxis to use somewhat larger aircraft. Part 298 Weight Limitation Investigation, CAB Order 72-7-61 (July 18, 1972). This court recently upheld that amendment in Hughes Air Corp. v. CAB, 160 U.S.App.D.C. , 492 F.2d 567 (1973)
 
 
 [8]
 CAB Order 72-9-39, Sept. 12, 1972, Joint Appendix at 25
 
 
 [9]
 148 U.S.App.D.C. at 27, 458 F.2d at 849
 
 
 [10]
 CAB Order 72-9-39, supra note 8, JA at 20. With respect to one of these unreviewed agreements, the Board did not actually accept ALPA's position that ALPA I required reconsideration of the air taxi exemption. Under this agreement a certificated carrier, Texas International Airlines, agreed to provide ground service for a fee to an exempt carrier, Metroflight Airlines. Texas International also reduced its own flight service to one round trip daily, the minimum allowed under its certificate. The Board reviewed Metroflight's exemption, but only assumed arguendo the applicability of ALPA I to such an agreement
 
 
 [11]
 CAB Order 73-1-3, Jan. 2, 1973, JA at 1
 
 
 [12]
 Id. at 5
 
 
 [13]
 Id. at 8
 
 
 [14]
 The appeal in No. 73-1069 is taken from the Board's denial of ALPA's motion to reopen 26 CAB cases in which, before our ALPA I decision, certificated carriers were authorized to suspend service on the basis of substitute-service arrangements with air taxi operators. CAB Order 73-1-49, Jan. 15, 1973, JA at 65. The Board's order denying ALPA's motion rested primarily on the show cause order and final order challenged in No. 73-1068 and on ALPA's failure to focus upon any disputed factual issues in any of these cases which would require an evidentiary hearing. Id. at 67
 In No. 73-1173 ALPA appeals from a Board authorization of a certificated carrier's temporary suspension of service, conditioned on provision of a minimum level of service by an air taxi operator. This authorization, resulting from finalization of a show cause order, was made subsequent to the Board's order in No. 73-1068, and the Board thus was able to apply its general position on the exemption issues as set forth in the 73-1068 orders to the specific facts of this suspension.
 
 
 [15]
 Since the exemption was within the CAB's discretion, the standard of our review is, of course, the traditional one of reasonableness
 * * * It is the task of this court to determine whether the Board acted within its power and authority in granting the exemption. We must be convinced that upon the record before it the Board acted reasonably. * * * Furthermore, it is not the prerogative of this court to substitute its judgment for that of the Board's on issues the Board has resolved in a rational manner.
 World Airways, Inc. v. CAB, 145 U.S.App.D.C. 3, 6, 447 F.2d 377, 380 (1971). See also North Central Airlines, Inc. v. CAB, 105 U.S.App.D.C. 207, 210-211, 265 F.2d 581, 584-585, cert. denied, 360 U.S. 903, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959); American Airlines, Inc. v. CAB, 98 U.S.App.D.C. 348, 354, 235 F.2d 845, 851 (1956), cert. denied, 353 U.S. 905, 77 S.Ct. 668, 1 L.Ed.2d 666 (1957). See generally Frontier Airlines, Inc. v. CAB, 142 U.S.App.D.C. 124, 131, 439 F.2d 634, 641 (1971).
 
 
 [16]
 Hughes Air Corp. v. CAB, supra note 7, 160 U.S.App.D.C. at , 492 F.2d at 569
 
 
 [17]
 CAB Order 72-7-61, supra note 7, at 33
 
 
 [18]
 148 U.S.App.D.C. at 28-29, 458 F.2d at 850-851
 
 
 [19]
 CAB Order 72-9-39, supra note 8, JA at 35
 
 
 [20]
 Ibid. See Reopened TAG-Wright Case, CAB Order 72-2-52 (Feb. 14, 1972); Aspen Airways, Inc., CAB Order 71-1-98 (Jan. 20, 1971). The Board can also consider the cumulative impact of several suspensions-substitutions on the extent of a particular air taxi's operations in a probe like that of New England Service Investigation, Docket 22973, into the route structure of an entire geographic region. Indeed, the Board stated it would consider the question of commuter certification in New England Investigation. CAB Order 72-9-39, supra note 8, JA at 35
 
 
 [21]
 CAB Order 72-9-39, supra note 8, JA at 28
 
 
 [22]
 160 U.S.App.D.C. at-- , 492 F.2d at 578
 
 
 [23]
 There surely is nothing especially financially enticing about the routes on which the certificated carriers want to suspend service. Even if the CAB provided air taxis with subsidies after certification, thus eliminating one of the advantages of the substitution arrangements, the air taxis might well decline to provide service. As stated in the Hughes opinion, 'The prospect of being subsidized can hardly be deemed a significant allure, since so many air taxi routes are precisely those from which certificated carriers withdrew because they could not support certificated service even with a subsidy.' 160 U.S.App.D.C. at 312, 492 F.2d at 578
 
 
 [24]
 148 U.S.App.D.C. at 27, 458 F.2d at 849
 
 
 [25]
 160 U.S.App.D.C. at 305, 492 F.2d at 571
 
 
 [26]
 We also note that removal of an economic burden from a certificated carrier may well ultimately redound through relatively lower rates to the benefit of the average passenger of that carrier. In exercising its ratemaking responsibilities the CAB is directed by the Act to take into consideration, inter alia, the need of each air carrier to obtain sufficient revenue to provide efficient service. 49 U.S.C. 1482(e)(5) (1970). If carrier revenues were not depleted by unprofitable short-haul routes, the Board should at least be more likely to disapprove rate increases on longer-haul profitable routes
 
 
 [27]
 The Board gave additional reasons why certification would not be in the public interest which did not turn on its conclusion that air taxis might not provide the replacement service without exemption. The Board stated that if air taxis were certificated the Board would no longer be able to limit, through the threat of certification, the size of replacement carrier aircraft and thereby encourage high frequency of air taxi service. The Board also noted that the minimum level of replacement carrier service on which certificated carrier suspensions are conditioned is normally greater than the 'adequate' level of service which the Board requires of a certificated carrier. And it found that after a replacement carrier was certificated the Board would not as a practical matter expect the suspended certificated airline to step back into the market if the replacement carrier's service proved deficient though legally adequate. To do so, the Board stated, 'would be to place two certificated carriers in a market unable to support even one.' CAB Order 72-9-39, supra note 8, JA at 29. Though we might question the Board's reasoning on the above findings, it is not necessary for us to address them given our determination that it was reasonable for the Board to conclude that the suspension-substitution arrangements would be endangered by requiring certification
 
 
 [28]
 ALPA cites Kodiak Airways, Inc. v. CAB, 144 U.S.App.D.C. 371, 380, 447 F.2d 341, 350 (1971), wherein we stated:
 * * * (A) grant (of exemption authority) is not necessarily in the public interest merely because it would bring about a marginal increase in the quantity or quality of air service. It must also be shown that the improved service outweighs any detrimental effects resulting from the grant. * * *
 
 
 [29]
 CAB Order 73-1-3, supra note 11, JA at 4
 
 
 [30]
 Id. at 6 n. 7
 
 
 [31]
 See note 26 supra
 
 
 [32]
 ,ALPA's citation to National Transportation Safety Board, Air Taxi Safety Study (Sept. 27, 1972), does not constitute such evidence. Though the report criticizes the general safety record of carriers exempted under the Part 298 regulation, it concludes that 'available data do not provide the means for meaningful comparison of the relactive safety levels in air taxi/commercial operations with other general aviation and certificated air carrier operations.' Id. at 12-13. More importantly, the report does not discuss the safety records of specific commuters at all
 
 
 [33]
 The opinion should consist of a written safety evaluation of the air taxi's operations which could be made a matter of public record in the suspension rroceeding. See Air Taxi Safety Study, supra note 32, at 16. We are not satisfied with the CAB's present policy of making undocumented inquiries at the FAA. In order to support its finding in this case, the Board should obtain form the FAA a written report on the safety of the operations of each exempt carrier providing replacement service
 
 
 [34]
 CAB Order 72-9-39, supra note 8, JA at 23
 
 
 [35]
 Eastern Airlines, Inc. v. CAB, 87 U.S.App.D.C. 331, 185 F.2d 426 (1950), dismissed as moot, 341 U.S. 901, 71 S.Ct. 613, 95 L.Ed. 1341 (1951)
 
 
 [36]
 Springfield Airport Authority v. CAB, 109 U.S.App.D.C. 197, 285 F.2d 277 (1960). See also Nebraska Dept. of Aeronautics v. CAB, 8 Cir., 298 F.2d 286, 290-293 (1962)
 
 
 [37]
 National Air Carrier Assn. v. CAB, 141 U.S.App.D.C. 31, 40, 436 F.2d 185, 194 (1970)
 
 
 [38]
 See, e.g., Trans World Airlines, Inc., CAB Order 71-8-91 (Aug. 19, 1971); Slick Airways, Suspension of Service, 26 CAB 779, 782 (1958)
 
 
 [39]
 148 U.S.App.D.C. at 30, 458 F.2d at 852
 
 
 [40]
 Ibid
 
 
 [41]
 The Board stated it assumed that the court, rather than requiring the Board to hold full-scale evidentiary hearings, intended the Board to follow those fair procedures which it deemed appropriate for resolution of the remanded issues. Included as one 'fair procedure' which it might find appropriate was the show cause order used on remand here. CAB petition for rehearing in ALPA I at 13-14
 
 
 [42]
 We do not suggest that as a general rule a court's refusal to correct an interpretation of its opinion contained in a petition for clarification or rehearing constitutes an approbation of that interpretation. But where an administrative agency expresses in a petition for clarification a good faith interpretation of an opinion remanding a proceeding to it for further consideration, a court's decision not to clarify the opinion should be relevant to a later court's review of the agency's compliance with the remanding opinion
 
 
 [43]
 United-Western, Acquisition of Air Carrier Property, 11 CAB 701, 707-708 (1950)
 
 
 [44]
 Id. at 708
 
 
 [45]
 See, e.g., West Coast-Empire Merger Case, 15 CAB 971, 975 (1952)
 
 
 [46]
 Southwest Renewal-United Suspension Case, 15 CAB 61, 76 (1952). See also Slick Airways, Suspension of Service, supra note 38, 26 CAB at 782; Frontier Certificate Renewal Case, 14 CAB 519, 556 (1951)
 
 
 [47]
 Seven States Area Investigation, 30 CAB 473, 475 (1960)
 
 
 [48]
 Frontier Airlines, Inc., CAB Order 72-1-100 at 10-11 (Jan. 28, 1972)
 
 
 [49]
 Id. at 11. See also Slick Airways, Suspension of Service, supra note 38, 26 CAB at 782
 
 
 [50]
 Even an administrative agency's discretionary power must, of course, be employed consistently. See Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933)
 
 
 [51]
 CAB Order 72-9-39, supra note 8, JA at 57-58
 
 
 [52]
 Id. at 58
 
 
 [53]
 Subsequent to our ALPA I decision, but prior to the Board's issuance of this show cause order, Mohawk was merged into Allegheny Airlines and Northeast was merged into Delta Air Lines
 
 
 [54]
 As indicated above, there were two other theretofore unreviewed suspensions tentatively approved in the show cause order. One of these suspensions involved Texas International rather than Mohawk or Northeast, see note 10 supra, but ALPA does not even attempt to make any specific showing why labor protective provisions should be imposed against Texas International
 
 
 [55]
 CAB Order 73-1-3, supra note 11, JA at 9-10 & n.15
 
 
 [56]
 Id. at 9 n.12
 
 
 [57]
 The Board's conclusion that a full evidentiary hearing on the labor protective provision issue would be futile might have led us to accept the CAB's procedure for consideration of this issue even is we had determined that our previous opinion used 'hearing' to refer to the full-scale hearing required by the Administrative Procedure Act for cases which a statute commands are 'to be determined on the record after opportunity for an agency hearing.' 5 U.S.C. 554. The Supreme Court only last term reaffirmed that an administrative agency, with rules providing for adequate summary procedures, need not hold adjudicatory hearings even when they are required by statute where it appears conclusively that the party requesting them would be unable thereat to carry its burden of proof. Weinberger v. Hynson, Westcott & Dunning, Inc., 421 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). See also FPC v. Texaco, Inc., 377 U.S. 33, 39, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351 U.S. 192, 202, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969)